No. 25-1341

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

JOSEPH and SERENA WAILES, et al.,

*Plaintiffs-Appellants,*

v.

JEFFERSON COUNTY PUBLIC SCHOOLS and JEFFERSON COUNTY PUBLIC
SCHOOLS BOARD OF EDUCATION,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Colorado
Case No. 1:24-cv-02439-RMR-NRN
Honorable Regina M. Rodriguez

## OPENING BRIEF OF APPELLANTS
## Oral Argument Requested

John J. Bursch
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

Katherine L. Anderson
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
kanderson@ADFlegal.org

Noel W. Sterett
Mallory B. Sleight
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
nsterett@ADFlegal.org
msleight@ADFlegal.org

David A. Cortman
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road N.E.
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
dcortman@ADFlegal.org

*Counsel for Appellants*

# TABLE OF CONTENTS

Table of Authorities ....................................................................................iv

Statement of Related Cases ..................................................................... 1

Statement of Jurisdiction ......................................................................... 1

Statement of Issues .................................................................................... 2

Introduction ................................................................................................. 3

Statement of the Case ............................................................................... 7

I.      Factual Background ........................................................................ 8

        A.    Jeffco promises to room boys and girls separately but
              then secretly rooms the Waileses' daughter with a boy. ........ 8

        B.    Jeffco's policy requires officials to make "case-by-case"
              accommodations for transgender students. .......................... 10

        C.    Jeffco accommodates students' preferred genders and
              keeps a record of their legal gender. .................................... 12

        D.    Jeffco refuses to accommodate the Waileses and denies
              their request for an opt-out. .................................................. 13

        E.    Jeffco secretly assigns a female student to sleep in the
              Rollers' son's cabin and monitor his showers. ..................... 15

        F.    Jeffco refuses to room the Brinkmans' daughter with
              girls only—compelling her exclusion from overnight
              activities with her classmates at Outdoor Lab. ................... 18

        G.    Jeffco puts the Perlmans to an impermissible choice. ......... 20

        H.    Plaintiffs share religious beliefs about sex, gender, and
              modesty that they seek to instill in their children. ............. 21

II.     Procedural History ...................................................................... 22

Standard of Review ...................................................... 24

Summary of the Argument ........................................ 25

Argument ..................................................................... 27

I.    The Perlmans have standing to challenge Jeffco's policy. ........... 27

II.   Plaintiffs are likely to prove—and certainly state a claim—that Jeffco's policy violates their free-exercise rights.................. 30

    A.    Jeffco's policy triggers strict scrutiny under *Mahmoud*—a case the district court ignored........................ 32

    B.    Jeffco's policy triggers strict scrutiny because it is neither neutral nor generally applicable. ............................ 35

    C.    Jeffco's policy fails strict scrutiny. ........................................ 39

III.  Plaintiffs are likely to prove—and certainly state a claim—that Jeffco's policy violates their fundamental rights. .................. 42

    A.    Parental rights are fundamental because they are deeply rooted in this Nation's history and tradition. ........... 44

    B.    Jeffco's policy infringes parent-plaintiffs' fundamental parental rights........................................................................ 47

    C.    The right to bodily privacy is also fundamental................... 49

    D.    Jeffco's policy infringes student-plaintiffs' fundamental right to bodily privacy. .......................................................... 51

IV.   A preliminary injunction is warranted and necessary to stop ongoing irreparable harm. .......................................................... 53

    A.    Plaintiffs have likelihood of success on the merits............... 54

    B.    Because plaintiffs are likely to prevail on the merits, the remaining factors also weigh in their favor. ................... 54

Conclusion.................................................................... 55

Statement Regarding Oral Argument ......................................................56

Certificate of Compliance ..........................................................................57

Certificate of Digital Submission ..............................................................58

Certificate of Service ..................................................................................59

## ATTACHMENTS PURSUANT TO 10TH CIR. R. 28.2(A)(1)

Order on Defs.' Motion to Dismiss Pls.' Amended Complaint and Pls.' Renewed Motion for Preliminary Injunction (Dkt. No. 74) .............. A001

Final Judgment (Dkt. No. 75) ........................................................... A021

# TABLE OF AUTHORITIES

## Cases

*Adams v. School Board of St. Johns County,*
  57 F.4th 791 (11th Cir. 2022)..........................................................51

*American Humanist Ass'n, Inc. v. Douglas County School District RE-1,*
  859 F.3d 1243 (10th Cir. 2017) ......................................................28

*Awad v. Ziriax,*
  670 F.3d 1111 (10th Cir. 2012) ................................................54–55

*Burwell v. Hobby Lobby Stores, Inc.,*
  573 U.S. 682 (2014) .........................................................................8

*Canedy v. Boardman,*
  16 F.3d 183 (7th Cir. 1994) ...........................................................50

*Carroll Independent School District v. U.S. Department of Education,*
  741 F. Supp. 3d 515 (N.D. Tex. 2024).............................................38

*Carson v. Makin,*
  596 U.S. 767 (2022) .......................................................................34

*Church of Lukumi Babalu Aye, Inc. v. Hialeah,*
  508 U.S. 520 (1993) ................................................................35–37

*City of Philadelphia v. Pennsylvania Human Relations Commission,*
  300 A.2d 97 (Pa. Commw. Ct. 1973).............................................51

*Clapper v. Amnesty International USA,*
  568 U.S. 398 (2013) .......................................................................30

*Colorado Environmental Coalition v. Wenker,*
  353 F.3d 1221 (10th Cir. 2004) .....................................................24

*Cressman v. Thompson,*
  719 F.3d 1139 (10th Cir. 2013) .....................................................27

*Cumbey v. Meachum,*
   684 F.2d 712 (10th Cir. 1982) ........................................................ 49

*Department of State v. Muñoz,*
   602 U.S. 899 (2024) ...................................................................... 43

*Dobbs v. Jackson Women's Health Organization,*
   597 U.S. 215 (2022) ...................................................................... 43

*Doe No.1 v. Bethel Local School District Board of Education,*
   No. 23-3740, 2025 WL 2453836 (6th Cir. Aug. 26, 2025) .............. 46

*Doe v. Luzerne County,*
   660 F.3d 169 (3d Cir. 2011) ........................................................... 50

*Does 1-11 v. Board of Regents of University of Colorado,*
   100 F.4th 1251 (10th Cir. 2024) ...................................................... 5

*Dubbs v. Head Start, Inc.,*
   336 F.3d 1194 (10th Cir. 2003) ..................................................... 49

*Faulkner v. Jones,*
   10 F.3d 226 (4th Cir. 1993) ........................................................... 50

*Finch v. Peterson,*
   622 F.3d 725 (7th Cir. 2010) ......................................................... 39

*Foote v. Ludlow School Committee,*
   128 F.4th 336 (1st Cir. 2025) ........................................................ 43

*Freedom From Religion Foundation, Inc. v. Mack,*
   49 F.4th 941 (5th Cir. 2022) .......................................................... 29

*Fulton v. City of Philadelphia,*
   593 U.S. 522 (2021) ............................................ 5, 26, 31, 36–37, 40

*Gonzales v. Carhart,*
   550 U.S. 124 (2007) ...................................................................... 25

*Greater Yellowstone Coalition v. Flowers,*
   321 F.3d 1250 (10th Cir. 2003) ................................................ 24–25

*Gruenke v. Seip*,
    225 F.3d 290 (3d Cir. 2000) ................................................ 44–45, 48

*H.L. v. Matheson*,
    450 U.S. 398 (1981) ........................................................... 44

*Heideman v. South Salt Lake City*,
    348 F.3d 1182 (10th Cir. 2003) ......................................... 53–54

*Hobby Lobby Stores, Inc. v. Sebelius*,
    723 F.3d 1114 (10th Cir. 2013) ........................................ 8, 36, 53

*Jeffery v. City of New York*,
    113 F.4th 176 (2d Cir. 2024) ............................................. 39

*Kennedy v. Bremerton School District*,
    597 U.S. 507 (2022) ........................................................... 30

*Lee v. Poudre School District R-1*,
    135 F.4th 924 (10th Cir. 2025) ......................................... 44, 47–48

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ........................................................... 28

*Mahmoud v. Taylor*,
    606 U.S. 522 (2025) ................ 4–6, 24–26, 30–34, 38–39, 46–47, 53

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*,
    584 U.S. 617 (2018) ........................................................... 37–38

*Meyer v. Nebraska*,
    262 U.S. 390 (1923) ........................................................... 42, 44

*Mirabelli v. Olson*,
    691 F. Supp. 3d 1197 (S.D. Cal. 2023) .............................. 48

*Parents for Privacy v. Barr*,
    949 F.3d 1210 (9th Cir. 2020) ........................................... 50, 52

*Parham v. J.R.*,
    442 U.S. 584 (1979) ........................................................... 48

*Pierce v. Society of Sisters*,
   268 U.S. 510 (1925) ...................................................... 44

*Planned Parenthood Ass'n of Utah v. Herbert*,
   828 F.3d 1245 (10th Cir. 2016) ................................... 34

*Prince v. Massachusetts*,
   321 U.S. 158 (1944) ...................................................... 44

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015) ...................................................... 39

*Reno v. Flores*,
   507 U.S. 292 (1993) ...................................................... 43

*School District of Abington Township v. Schempp*,
   374 U.S. 203 (1963) ...............................................27–28

*Steffel v. Thompson*,
   415 U.S. 452 (1974) ...................................................... 30

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) ...................................................... 28

*Tandon v. Newsom*,
   593 U.S. 61 (2021) ........................................................ 37

*Teigen v. Renfrow*,
   511 F.3d 1072 (10th Cir. 2007) ...................................... 7

*Thomas v. Kaven*,
   765 F.3d 1183 (10th Cir. 2014) ................................... 24

*Timken v. South Denver Cardiology Associates, P.C.*,
   155 F.4th 1227 (10th Cir. 2025)................................... 42

*Tinker v. Des Moines Independent Community School District*,
   393 U.S. 503 (1969) ...................................................... 31

*Torres v. Wisconsin Department of Health & Social Services*,
   859 F.2d 1523 (7th Cir. 1988) ...................................... 51

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
    582 U.S. 449 (2017) ........................................................................ 37

*Troxel v. Granville*,
    530 U.S. 57 (2000) ...................................... 6, 42, 44, 47–48

*United States v. Playboy Entertainment Group, Inc.*,
    529 U.S. 803 (2000) ........................................................ 41

*United States v. Virginia*,
    518 U.S. 515 (1996) ........................................................ 50

*Ward v. Utah*,
    321 F.3d 1263 (10th Cir. 2003) .................................... 27

*Washington v. Glucksberg*,
    521 U.S. 702 (1997) ........................................................ 42

*Wisconsin v. Yoder,*
    406 U.S. 205 (1972) ........................................................ 32

## **Constitutional Provisions**

U.S. Const. amend. XIV, § 1 ............................................ 41

## **Other Authorities**

1 William Blackstone, *Commentaries on the Laws of England*
    (10th ed. 1787) ................................................................ 44

2 James Kent, *Commentaries on American Law* (5th ed. 1844) ............ 44

Eric A DeGroff, *Parental Rights & Public School Curricula:*
    *Revisiting* Mozert *after 20 Years*,
    38 J.L. & Educ. 83 (2009) .............................................. 44

Ruth Bader Ginsburg, *The Fear of the Equal Rights Amendment*,
    Wash. Post (Apr. 7, 1975) .............................................. 51

Samuel T. Summers, Jr., *Keeping Vermont's Public Libraries Safe*,
    34 Vt. L. Rev. 655 (2010) .............................................. 50

William Baude, Jud Campbell & Stephen E. Sachs, *General Law and the Fourteenth Amendment*, 76 Stan. L. Rev. 1185 (2024) ........................................................... 42

## STATEMENT OF RELATED CASES

There are no prior or related appeals.

## STATEMENT OF JURISDICTION

Plaintiffs are four sets of parents—Joseph and Serena Wailes; Bret and Susanne Roller; Robert and Jade Perlman; Daniel and Annette Brinkman—and their children, who are, were, or will be enrolled in Jefferson County Public Schools (Jeffco). They sued Jeffco and its Board of Education in the United States District Court for the District of Colorado under 42 U.S.C. § 1983, raising First and Fourteenth Amendment claims. The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343.

On August 7, 2025, about a week after fact and expert discovery closed, the district court entered final judgment dismissing all plaintiffs' claims under Federal Rule of Civil Procedure 12 and denying their renewed motion for preliminary injunction. 3.App.705.[1] Plaintiffs filed a notice of appeal on August 29, 2025—within the 30-day period set by 28 U.S.C. § 2107(a) and Federal Rule of Appellate Procedure 4(a)(1)(A). 3.App.707. This Court has jurisdiction under 28 U.S.C. § 1291.

---

[1] Citations to the three-volume appendix are to "[volume].App.[page]."

## STATEMENT OF ISSUES

Jeffco promises parents that boys and girls are roomed separately on overnight school trips. But under its Transgender Students Policy, Jeffco will assign a boy who identifies as a girl to a girls' room (and vice versa) without notice to, or consent from, their parents. That's what happened to the Waileses' daughter and the Rollers' son. And that is what plaintiffs sued to prevent. Because Jeffco will not allow them to opt out of the policy or agree to room their children only with the same sex, Jeffco effectively excludes their children from overnight activities.

The district court's ruling raises four issues for review:

1.  The Perlmans alleged that their daughter's basketball team has overnight trips—subject to the policy—that "will begin to occur" during the upcoming season. Do the Perlmans have standing?

2.  The Supreme Court in *Mahmoud v. Taylor* recently reaffirmed parents' free-exercise right to direct their children's religious upbringing in a public-school context. Did the court err by failing to discuss *Mahmoud* in its ruling dismissing plaintiffs' free-exercise claims and by otherwise finding Jeffco's policy to be neutral and generally applicable?

3.  The Constitution secures parents' fundamental right to direct their children's upbringing and care and children's right to bodily privacy. Did the court err in rejecting those rights?

4.  Did the court err in denying a preliminary injunction?

## INTRODUCTION

As she readied for bed over a thousand miles from home, an eleven-year-old girl discovered what Jeffco had concealed. Her bedmate was not a female, but a male identifying as a girl. Trip leaders assured her parents that boys and girls would be roomed separately and told the students that boys were not allowed on the girls' floor without permission. But those assurances echoed a reality Jeffco no longer honors. Jeffco's change in course disregards the many parents and students who still believe that boys and girls should be roomed separately because their biological differences—and the privacy and modesty concerns that flow from those beliefs—matter.

They matter to the Waileses, who could not believe Jeffco had put their daughter in this situation. They matter to the Rollers, who learned only after their son's trip that Jeffco had assigned a female to share his cabin and monitor his showers. They matter to the Perlmans, whose daughter suffered sexual harassment at a Jeffco middle school and will not risk Jeffco rooming her with a boy. And they matter to the Brinkmans, whose daughter was excluded from overnight activities because Jeffco refused to room her only with girls.

They are not asking Jeffco to scrap its policy altogether or to exclude any student from overnight activities. What they want is an accommodation that will allow their children to participate fully in overnight activities and not penalize them for their religious beliefs.

Their faith forbids their children from sharing a bed, bedroom, or shower facilities with the opposite sex. And to accommodate their children on overnight school trips, Jeffco need not disclose any student's private information or exclude them on account of their gender identity.

But Jeffco has refused this modest accommodation—even though the Constitution requires it. How Jeffco rooms students "is directly contrary to the religious principles that the parents in this case wish to instill in their children." *Mahmoud v. Taylor*, 606 U.S. 522, 552 (2025). Neither the parents' right to instill those principles, nor their children's right to live by them, is "shed at the schoolhouse gate." *Id*. at 545 (citation modified). So Jeffco, "like all government institutions, may not place unconstitutional burdens on [their] religious exercise." *Id*.

Yet that is what Jeffco has done. What happened to the Waileses' daughter and the Rollers' son was no accident. It was the result of a Jeffco policy that directs Jeffco staff to assign students to share overnight accommodations with the opposite sex without notice to, or consent from, parents who object to that sleeping arrangement. Jeffco keeps them in the dark about the sex of their child's roommates. Worse, Jeffco will not allow them to opt out or honor requests to room children only with the same sex. Jeffco refuses to do so even though it can track students' sex—without disclosing that information to anyone else.

This denial of a reasonable opt-out is precisely what *Mahmoud* forbids. Public schools may not "substantially interfere with the

religious development of the parents' children" or threaten to "undermin[e] the religious beliefs and practices that the parents wish to instill in their children." 606 U.S. at 565 (citation modified). Jeffco's policy does both. Nor may schools pressure students to conform to beliefs and practices that contradict their faith. *Id.* at 554–55. Yet Jeffco does that by conditioning participation in overnight activities on parents' and students' "willingness to accept a burden on their religious exercise." *Id.* at 561. *Mahmoud* calls that "unacceptable." *Id.* at 550.

But the district court didn't even discuss *Mahmoud* in dismissing plaintiffs' claims under Rule 12. And it misapplied *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021), by concluding that Jeffco's policy is neutral and generally applicable. That policy explicitly says that "sleeping arrangements" are determined on a "case-by-case basis." 3.App.429. It also grants officials broad discretion to make individual-ized assessments to accommodate "the needs of students who are transgender." *Id.* Under *Fulton*, Jeffco "may not refuse" to extend that discretionary system to accommodate plaintiffs' religious beliefs absent a compelling reason. 593 U.S. at 534; *see also Does 1-11 v. Bd. of Regents of Univ. of Colo.*, 100 F.4th 1251, 1272–73 (10th Cir. 2024) (holding a policy requiring "case-by-case" assessments of students' needs was "in no way generally applicable").

In addition to the policy's lack of facial neutrality or general applicability—which the district court should have accepted given

parents' factual allegations—Jeffco has not applied its policy in a neutral or generally applicable manner. The court not only disregarded the allegations concerning the policy's flawed application but also held that Jeffco's policy satisfies strict scrutiny in any event. 3.App.701. It doesn't. Each of these errors requires reversal.

The district court was equally dismissive of the parents' parental-rights claim. According to the district court, "parents have no right to replace public education with their own personal views, nor a right to control each and every aspect of their children's education and oust the state's authority over that subject." 3.App.690. But plaintiffs seek no such thing. They are simply asking Jeffco to room their children in a way that doesn't violate or penalize their religious beliefs and allows them to participate fully in overnight activities with their classmates. Their request aligns with our history and tradition, which recognize parents' fundamental right to direct their child's "religious upbringing" in the school context, *Mahmoud*, 606 U.S. at 547, and "care, custody, and control," *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality op.).

Because Jeffco's policy infringes these rights—as well as student-plaintiffs' own fundamental right to bodily privacy—it triggers, and fails, strict scrutiny. Jeffco does not have a compelling interest in rooming student-plaintiffs with the opposite sex. And there are less restrictive ways to further its interests than depriving parents of their authority to make important decisions about sharing a bedroom or

shower facility with the opposite sex. No student should have to unwillingly endure an invasion of their privacy in these settings—where the expectation of privacy is at its apex. And all students deserve the equal opportunity to participate in overnight activities.

Until Jeffco is barred from rooming student-plaintiffs with the opposite sex, it will continue to put plaintiffs to an impermissible choice with every upcoming overnight activity or athletic trip: either forgo these publicly-available benefits and formative school experiences or risk Jeffco placing student-plaintiffs in overnight accommodations that violate their and their parents' religious beliefs, parental rights, and privacy. That is both ongoing and irreparable harm.

For these reasons, this Court should reverse the district court and order that court to enjoin Jeffco from rooming student-plaintiffs with the opposite sex.

## STATEMENT OF THE CASE

This is an appeal from the district court's dismissal of plaintiffs' verified complaint under Rule 12 and denial of their renewed motion for preliminary injunction, which relied on the complaint's verified facts. 2.App.354–425 (complaint); 3.App.685–704 (decision). When reviewing the grant of the motion to dismiss, the Court must accept those facts as true and view them in the light most favorable to plaintiffs. *Teigen v. Renfrow*, 511 F.3d 1072, 1078 (10th Cir. 2007). And the verified facts

Jeffco did not contradict are to be "deemed admitted for preliminary injunction purposes." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1146 (10th Cir. 2013), aff'd sub nom., *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014). These facts show the harms that occur when public schools deny parents their fundamental right to direct their child's religious upbringing, education, and care.

## I.     Factual Background

### A.     Jeffco promises to room boys and girls separately but then secretly rooms the Waileses' daughter with a boy.

The Waileses enrolled their daughter, D.W., in a Jeffco school that offered fifth-grade students a multi-day trip to Philadelphia and Washington, D.C. 2.App.361. Her principal assured parents, including the Waileses, that girls would be roomed on one floor and boys on another. 2.App.362. And trip leaders told students boys were not allowed on the girls' floor (and vice versa) without permission. 2.App.364. No one suggested "boys" and "girls" meant anything but the two sexes. 2.App.362, 364.

Jeffco assigned the Waileses' eleven-year-old daughter to a hotel room with three other students—two she knew and one she did not know from another Jeffco school. 2.App.363. Their room had two beds for the four students to share. *Id.* As she readied for bed on the first night, D.W. discovered that the student with whom she'd be sharing a bed was actually a male who identifies as a girl. 2.App.364.

Shocked and uncomfortable, D.W. snuck away to the bathroom and called her mother to reveal that her bedmate was a boy. 2.App.365. Mrs. Wailes had traveled on the trip because the Waileses thought D.W. was too young to travel so far without a parent. 2.App.362. So she had paid to stay in a separate room at the hotel with another mother. *Id*.

At first, Mrs. Wailes thought her daughter had misunderstood. 2.App.365. After all, her daughter was only 11, and Jeffco had promised to room boys and girls separately. *Id*. But D.W. relayed what her bedmate had told her. *Id*.

When Mrs. Wailes reported the issue to trip leaders, they confirmed that D.W.'s bedmate was male and had been intentionally assigned to the girls' floor. 2.App.366. Rather than resolving Mrs. Wailes' concerns, they asked D.W. to switch beds but stay in the same room. *Id*. They then lied to D.W.'s roommates and told D.W. to do the same, claiming D.W. needed to switch beds to be closer to the air conditioner. 2.App.367. But that plan didn't fix anything and unraveled after D.W.'s other roommate offered to let the male student switch to the bed near the air conditioner to remain with D.W. *Id*.

D.W. was scared to speak up in front of her roommates on such a sensitive subject. *Id*. She did not want to make the male student feel as uncomfortable as she was. *Id*. So she went back into the hall—visibly distraught—to find her mom. *Id*. Only after her mom stepped in did

Jeffco finally move the male student to another room—again concealing the true reason for the move from the others. *Id*.

Because Jeffco had concealed that it assigned a male to their daughter's room, the Waileses were denied the opportunity to spare her from this jarring situation or seek an accommodation before the trip. 2.App.384. The male student, by contrast, knew the facts and could choose to room with either boys or girls. *Id*. This experience harmed D.W. and the Wailes family and proves Jeffco's assurances about separating boys and girls were misleading. 2.App.395.

After the trip, the Waileses tried to figure out how Jeffco could room their daughter with a male without notice or their consent. 2.App.368. They eventually found the Transgender Students Policy— titled "Equal Education Opportunities—Transgender Students." *Id*. They had had no reason to read it before the trip because none of their children identify as transgender, and trip leaders had never mentioned it or referenced it in trip materials. 2.App.362.

## B.  Jeffco's policy requires officials to make "case-by-case" accommodations for transgender students.

All Jeffco students should have the equal opportunity to participate in overnight activities and athletic trips. Yet Jeffco's policy provides that promise only to transgender students. It states that, "[i]n the planning of sleeping arrangements during overnight activity and athletic trips, the needs of students who are transgender shall be

10

assessed on a case-by-case basis." 3.App.429. And "[i]n most cases, students who are transgender should be assigned to share overnight accommodations with other students that share the student's gender identity consistently asserted at school." *Id*. Not all cases, "most." *Id*.

The policy doesn't explain how Jeffco determines when it will or will not room students with members of the opposite sex. *Id*. It also does not define how "consistently asserted" a student's gender identity must be before he or she can be roomed with the opposite sex. *Id*. By its terms, it also covers those who don't consistently assert a male or female identity, e.g., those who are "gender non-conforming" or non-binary. 3.App.427–29.

The policy guarantees that students who identify as transgender will never be "required to share a room with students whose gender identity conflicts with their own." 3.App.429. But it does not provide a similar guarantee for students who object—for religious or privacy reasons—to sharing a room with the opposite sex. *Id*. So while Jeffco guarantees individualized accommodations for transgender-identifying students in order to guarantee *them* an equal opportunity to participate in overnight activities and athletic trips, Jeffco will not accommodate non-transgender students who object to sharing private spaces with the opposite sex, preventing them from participating equally in overnight activities and athletic trips. *Id*.

At the time of D.W.'s trip, the policy explained that its purposes are "to address the needs of students who are transgender and gender nonconforming" and "protect the legal rights and safety of such students." 1.App.139. But the policy fails to do the same for other students. To that end, the policy barred staff from "disclos[ing] information that may reveal a student's transgender status to others, including parents," unless legally required or authorized by the student. 1.App.140. This is how Jeffco could conceal D.W.'s bedmate's sex from her and her parents.

## C.    Jeffco accommodates students' preferred genders and keeps a record of their legal gender.

Jeffco uses a customizable student-information system called Infinite Campus to implement its policy. 2.App.381–382. When parents enroll their children, Jeffco asks for their children's birth certificate. 2.App.382. Then Jeffco keeps a record of their "legal gender." *Id*. As alleged, Jeffco could use this system to confidentially track students' sex and ensure student-plaintiffs are not roomed with the opposite sex—all without disclosing that information to others. 2.App.383.

Jeffco has tailored the system to allow students to use a separate "gender" field to indicate their preferred gender. 2.App.381. And that field need not match the student's sex or "legal gender"—which is a separate field. 2.App.382. So, as alleged, Jeffco administrators can track

and access students' records to know their sex and when it differs from their gender identity. 2.App.382–83.

Jeffco permits students who identify as transgender, nonbinary, or gender-nonconforming to select or change their gender identity in Infinite Campus. 2.App.382. By selecting their preferred gender, students can choose whether they will be assigned to room with boys or girls, regardless of their sex. *Id*. They can change their gender identity right before a trip, and Jeffco does not verify whether that identity has been "consistently asserted." *Id*.

In practice, this allows Jeffco to room children based on gender identity—not sex—even for children at least as young as 11. 2.App.384. That is how D.W. ended up with a male bedmate. *Id*. And that is how other children have been assigned opposite-sex roommates without their parents' knowledge or consent. *Id*.

### D.    Jeffco refuses to accommodate the Waileses and denies their request for an opt-out.

Once the Waileses discovered the policy, they sent a letter to Jeffco through counsel in December 2023. *Id*. The Waileses were planning to send their children on future trips, so they needed to understand what happened and how to prevent it from recurring. 2.App.387. They asked Jeffco to inform parents of the policy, allow them to opt out, and ensure their children would not be roomed with the opposite sex—all while maintaining every student's privacy. 2.App.386.

13

But Jeffco refused. 2.App.384–386. Jeffco would promise only to "not knowingly assign students of different birth sexes to share a bed." 2.App.384. That promise meant little because, as the Waileses knew, Jeffco assigns students to *rooms*, not beds. Even so, that promise necessarily admits three things: (1) Jeffco can separate students by sex; (2) it can make individualized accommodations; and (3) it would not accommodate the Waileses' request to room their children only with the same sex. *Id*.

At the time, Jeffco's policy contained accommodation language providing that any student "who has a need or desire for increased privacy … should be provided a reasonable accommodation, which may include a private room." 1.App.141. But Jeffco cut that language from the policy in July 2024. 2.App.381.

And according to publicly posted communications, Jeffco previously had a parental-consent protocol that required school officials to obtain parents' consent before rooming their child with a student of the opposite sex who identified as transgender. 3.App.604–07. When plaintiffs brought this protocol to the district court's attention in their renewed motion for preliminary injunction, 3.App.576–77, Jeffco did not dispute it. *See* 3.App.617–37. But at some point, Jeffco abandoned that protocol and stopped seeking parental consent, because Jeffco did not ask either the Waileses or Rollers for their consent before rooming their

children with the opposite sex. 3.App.575–76. And Jeffco will not agree to do so now. *Id*.

### E.    Jeffco secretly assigns a female student to sleep in the Rollers' son's cabin and monitor his showers.

Bret and Susanne Roller have three children, two of whom still attend Jeffco schools. 2.App.358. When their son was in middle school, they received a letter about a week-long school trip called Outdoor Lab. 2.App.369–70. The letter said: "All 6th grade students enrolled in Jeffco Public Schools are expected to attend Outdoor Lab with their homeschool peers and teachers. The week onsite is immersed in 6th grade curriculum that cannot be replicated in the classroom." *Id*.

Sixth graders attend Outdoor Lab at one of Jeffco's two mountain campuses: Windy Peak or Mt. Blue Sky. 2.App.370. Each campus has its own principal and permanent staff. *Id*. Jeffco hires recent Jeffco graduates to serve as interns, who stay for a semester or a year. *Id*. Jeffco also has high-school students serve as counselors or leaders, who room with and help supervise the sixth-grade students. 2.App.370–71.

When students applied to be counselors, the application form had informed them of Jeffco's Transgender Student Policy and allowed them to indicate whether they wanted to stay in a "Male Bunk House" or "Female Bunk House." *Id*. But Jeffco later changed the form to remove any reference to the policy. 2.App.371.

All the while, Jeffco did not inform parents about the policy in the Outdoor Lab paperwork. *Id*. In fact, Jeffco told the Rollers that the sixth graders would be staying in sex-separated cabins and that their son would be roomed with other sixth-grade boys. *Id*. And at Outdoor Lab, students cannot choose their roommates. *Id*.

Jeffco will also not inform parents before Outdoor Lab who their child's high school counselor will be. 2.App.372. So it wasn't until the Rollers' son, B.R., arrived at Outdoor Lab that he discovered that Jeffco had assigned an eighteen-year-old female student to stay in his cabin. *Id*. The Rollers knew this student through the 4H Club in which they participated—and where that student identified as a female. *Id*. But unbeknownst to the Rollers, at the time of the Outdoor Lab trip, this student identified as "non-binary." 2.App.373.

Under the Transgender Students Policy, Jeffco assigned this female counselor to serve as a "male-identifying" counselor in the all-boys cabin. *Id*. This eighteen-year-old female counselor slept in the same cabin where the eleven- and twelve-year-old boys slept, dressed, and undressed. 2.App.372. The female counselor was also tasked with monitoring their showers to control their hot-water use. 2.App.373. The shower stalls have only thin curtains that do not provide sufficient privacy from others. *Id*. And boys enter and exit them from a common area where the counselor stands. *Id*.

B.R. and other boys felt deeply uncomfortable with this. *Id*. B.R. refused to shower during the four-day trip. *Id*. And he and other boys resorted to changing inside their sleeping bags. *Id*.

Because students at Outdoor Lab do not have phone privileges to call their parents, it wasn't until Mrs. Roller picked B.R. up from Outdoor Lab that she discovered her son's jarring camp experience. 2.App.372. The first thing he told her was, "I had a girl in my cabin." *Id*.

Mrs. Roller was shocked Jeffco had assigned an eighteen-year-old female to sleep next to her son and supervise his showers. 2.App.374. So like the Waileses, she began looking for a policy and talking to others in the community about her son's experience. *Id*.

Mrs. Roller raised the issue with B.R.'s principal, who confirmed that Jeffco's actions complied with its policy. 2.App.387. He explained that the policy was written to protect transgender students, not to protect all students' privacy. *Id*. Jeffco administrators gave the Rollers no way to avoid similar situations. 2.App.388. Both B.R. and his sister, D.R., still attend Jeffco schools and plan to participate in activities that require overnight stays. 2.App.396. So unless Jeffco is enjoined from rooming them with the opposite sex, they will face the same risk of harm with every new overnight activity they wish to attend.

**F.    Jeffco refuses to room the Brinkmans' daughter with girls only—compelling her exclusion from overnight activities with her classmates at Outdoor Lab.**

Daniel and Annette Brinkman now have three children in Jeffco schools. 2.App.377. Their oldest daughter, A.G.B., was a sixth grader scheduled to attend Outdoor Lab in January 2025. 2.App.378. Both parents had fond memories of attending Outdoor Lab as students and wanted their daughter to have the same opportunity. *Id*. But they had heard what happened to the Waileses and Rollers and were concerned Jeffco would room their daughter with the opposite sex. 2.App.380.

So they contacted multiple Jeffco officials—including A.G.B.'s principal, the Outdoor Lab administration, and Superintendent Ken Paxton—to request an accommodation that would ensure that A.G.B. would not share a cabin or shower with a male. 2.App.388–90. No one granted their request for an opt-out. *Id*. Most never responded at all. 2.App.389–90. Jeffco's chief legal counsel, Julie Tolleson, responded but did not grant their request. 2.App.390.

At a contemporaneous parent meeting for Outdoor Lab, Mrs. Brinkman watched as a Jeffco official told hundreds of parents that student counselors would be roomed based on biological sex. 2.App.391. And Superintendent Paxton, who attended, did not correct this misleading statement. 2.App.392. The next day, Mrs. Brinkman emailed him and other officials, explaining how misleading the presentation was. 2.App.393. She then asked Jeffco to disclose the

policy to parents and provide an accommodation that would allow her daughter to participate fully at Outdoor Lab. 2.App.380, 391–393. But Jeffco refused. *Id.*

The Brinkmans' daughter still wanted to attend Outdoor Lab and stay overnight with her classmates. 2.App.394. Because Jeffco refused to ensure their daughter would not be roomed with the opposite sex, the Brinkmans could not allow her to stay overnight. *Id.* What Superintendent Paxton called "day participation" required the Brinkmans to pick her up each night and return her to the mountain campus every morning. 2.App.393–94. It was the only option that allowed their daughter to attend some of Outdoor Lab while avoiding the risk that Jeffco would assign her to share a cabin with a male student or counselor. 2.App.395.

Although their daughter wanted to stay overnight with her classmates, 2.App.394, Jeffco's policy effectively excluded her from doing so. *Id.* It conditioned her full participation on her and her parents' willingness to accept Jeffco's rooming policy without an exception. To make even "day participation" possible, the Brinkmans had to pay for lodging near Outdoor Lab, and Mrs. Brinkman missed work to stay with A.G.B. and drive her back and forth each day. 2.App.394; 3.App.575. Like the Waileses and Rollers, Jeffco's policy harmed the Brinkmans. 3.App.578.

### G.    Jeffco puts the Perlmans to an impermissible choice.

Robert and Jade Perlman's daughter was sexually harassed by a boy in her Jeffco middle school. 2.App.376. For that reason and others, including their religious beliefs, they object to Jeffco rooming her with a boy on any overnight trip. 2.App.377. Because she excels in athletics and plays varsity basketball, she travels with her team to play games that require overnight stays. 2.App.376. They believe these team trips promote their daughter's independence, maturity, and growth in a way that cannot be replicated in the classroom. 2.App.375.

Because these trips are subject to Jeffco's policy, the Perlmans (through counsel) asked Jeffco to agree not to room their daughter with the opposite sex on these trips and moved for a preliminary injunction because Jeffco refused. 1.App.017–021; 2.App.325–27. So Jeffco has put them to an impermissible choice: either forego the benefits of their daughter traveling with her team or accept that Jeffco could room her with a male—without notice—in violation of their religious beliefs and her privacy. 2.App.397. Because she is only a sophomore this year, and has already played with the varsity team as a freshman, she will likely have opportunities to travel this season and the next two years. 2.App.376. But with each opportunity, Jeffco's policy will put the Perlmans to this impermissible choice.

### H.    Plaintiffs share religious beliefs about sex, gender, and modesty that they seek to instill in their children.

All four plaintiff families—the Waileses, Rollers, Brinkmans, and Perlmans—believe God created every person in His image as either male or female, and that this biological reality cannot change. 2.App.360–61, 369, 375, 378–80. They teach their children that honoring God includes honoring the body He gave them and preserving bodily privacy between the sexes given their inherent differences. *Id.*

Their faith forbids them from allowing their children to share a bed, bedroom, or shower facilities with an unrelated member of the opposite sex, regardless of that person's gender identity. *Id.* They believe parents have a God-given duty to direct their children's upbringing and to protect them from situations that compromise modesty or contradict their faith teachings on sex. *Id.*

Jeffco's policy conflicts with their religious beliefs because it permits boys to be roomed with girls (and vice versa) without their knowledge or consent. 2.App.381–82. And it offers protections and accommodations only to students who identify as transgender—not to students whose religious convictions or privacy expectations require separation by sex. 2.App.384, 387–88, 394. By removing the language that once promised a "reasonable accommodation" for students seeking privacy, Jeffco has ensured that families like plaintiffs have no way to

protect their children without denying them the benefit of participating in important overnight activities with their classmates. 2.App.397.

## II.   Procedural History

After Jeffco refused plaintiffs' request to room student-plaintiffs only with the same sex, the Waileses, Rollers, and Perlmans sued Jeffco and its Board of Education on September 4, 2024. 1.App.001. After filing suit, plaintiffs (through counsel) again asked Jeffco to agree not to room student-plaintiffs with opposite-sex students on upcoming trips. 2.App.326–27. But Jeffco again refused. 2.App.325.

Plaintiffs then moved for a preliminary injunction to stop Jeffco from rooming their children with the opposite sex on specific upcoming trips. 1.App.010–43. But the district court denied their motion based on Jeffco's representation that it "freely grants accommodations to all." 2.App.162, 337, 352. In the district court's view, plaintiffs had not sufficiently asked Jeffco for an accommodation—even though Jeffco conceded it would not agree to room their children with only the same sex on upcoming trips. 2.App.348.

Jeffco then moved to dismiss plaintiffs' complaint. 1.App.004. But plaintiffs filed their First Amended Verified Complaint as of right under Rule 15(a)(1)—which mooted defendants' motion. 2.App.354–425. The amended complaint added the Brinkmans as plaintiffs and detailed how

far parent-plaintiffs had gone to request accommodations from Jeffco, only to have Jeffco ignore or deny their requests. 2.App.383–97.

Jeffco then moved to dismiss the amended complaint per Rule 12. 3.App.510–31. Meanwhile, plaintiffs filed a renewed motion for preliminary injunction. 3.App.569–91. They did so for three reasons. First, the amended complaint added the Brinkmans, and they also needed preliminary relief. 3.App.574–75. Second, new evidence showed that Jeffco's prior protocol required parental consent before rooming a child with a student of the opposite sex who identified as transgender. 3.App.576. And third, student-plaintiffs had other upcoming trips, some of them already scheduled, such as the Brinkmans' daughter's Outdoor Lab trip. 3.App.574–75.

But six months elapsed, and the district court allowed those trips to pass without ruling on the motion for preliminary injunction. *See* 1.App.005–08. While Jeffco's motion to dismiss was pending, the parties conducted months of fact and expert[2] discovery, including twenty depositions. Then, on August 7, 2025, less than a week after the close of discovery, the court granted Jeffco's motion to dismiss and denied plaintiffs' motion for preliminary injunction. 3.App.685–704. It

---

[2] The parties designated experts with conflicting opinions on whether transgender-identifying students would be harmed if Jeffco accommodated student-plaintiffs and on whether Jeffco's alleged administrability concerns are legitimate. The district court did not cite to or consider those opinions in finding for Jeffco under Rule 12.

dismissed the Perlmans under Rule12(b)(1) for lacking standing and dismissed all other plaintiffs' claims under Rule 12(b)(6). 3.App.689–90. It also denied plaintiffs' motion for preliminary injunction because it found that plaintiffs were not likely to succeed on the merits and hadn't shown irreparable injury. 3.App.703–04.

Plaintiffs timely filed their notice of appeal on August 29, 2025. 3.App.707.

## STANDARD OF REVIEW

The standard of review is de novo for the district court's decisions under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). *Colo. Env't Coal. v. Wenker*, 353 F.3d 1221, 1227 (10th Cir. 2004). The Court must "accept all the well-pleaded allegations of the complaint as true" and "construe them in the light most favorable to the plaintiff[s]." *Thomas v. Kaven*, 765 F.3d 1183, 1190 (10th Cir. 2014).

Plaintiffs seeking a preliminary injunction must show that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm without that relief, (3) the balance of equities tips in their favor, and (4) the injunction is in the public interest. *Mahmoud*, 606 U.S. at 546. The Court reviews the district court's denial of a motion for preliminary injunction for abuse of discretion. *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1255 (10th Cir. 2003). A court abuses its discretion when it "bases its decision on an erroneous

conclusion of law or where there is no rational basis in the evidence for the ruling." *Id.* (quotation omitted). This Court reviews "legal determinations de novo," *id.*, and has "an independent constitutional duty to review factual findings where constitutional rights are at stake," *Gonzales v. Carhart*, 550 U.S. 124, 165 (2007).

## SUMMARY OF THE ARGUMENT

Based on a series of legal errors, the district court dismissed plaintiffs' claims under Rule 12 and denied their motion for preliminary injunction. This Court should reverse.

First, the Perlmans have standing because the policy directly affects their daughter, who is on a Jeffco basketball team that takes overnight trips subject to the policy. Because Jeffco will not accommodate their request to room her only with the same sex, Jeffco is putting them to an unconstitutional choice that is inflicting present and ongoing harm sufficient to establish standing. And under *Mahmoud*, the court need not "wait and see" how Jeffco will room her on any particular trip before evaluating the Perlmans' claims. 606 U.S. at 560.

Second, plaintiffs not only plausibly state free-exercise claims, but they are likely to succeed on them under both *Mahmoud* and *Fulton.* But the district court ignored *Mahmoud* and misapplied *Fulton.* The verified facts show how Jeffco's policy and refusal to allow an opt-out infringes parent-plaintiffs' right to direct their children's religious

upbringing. And Jeffco's refusal to extend its discretionary and individualized system to accommodate student-plaintiffs' religious beliefs imposes "a pressure to conform" to Jeffco's views on issues of sex, gender, and modesty. *Mahmoud*, 606 U.S. at 554. As alleged, Jeffco's policy is not neutral and generally applicable—on its face or as applied.

Third, Jeffco's policy infringes fundamental rights deeply rooted in our history and tradition: parents' fundamental right to direct the upbringing, education, and care of their children; and the right to bodily privacy. The district court erred in rejecting those rights. It did so based on an overly narrow reading of those rights and a misunderstanding of plaintiffs' claims. Plaintiffs are not seeking to "oust the state's authority" over curriculum, as the district court claims, 3.App.690, but to protect their decision-making authority over whether their young children will share a bedroom or shower facility with the opposite sex.

Because Jeffco's policy infringes plaintiffs' constitutional rights, it triggers strict scrutiny. Contrary to the district court's holding, Jeffco cannot satisfy that standard at the pleading stage or by relying on broadly formulated interests. *Fulton*, 593 U.S. at 541. Nor can Jeffco claim an interest in protecting "one group of students from stigma and isolation by stigmatizing and isolating another." *Mahmoud,* 606 U.S. at 568. So this Court should reverse and issue injunctive relief.

## ARGUMENT

### I.  The Perlmans have standing to challenge Jeffco's policy.

Public "school children and their parents" have "standing to complain" about "laws and practices" that "directly affect[]" them. *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 224 n.9 (1963). As pleaded, Jeffco's policy affects the Perlmans because it forces them to decide whether their daughter will forgo the formative benefits of traveling with her team or face the risk Jeffco will room her with an opposite-sex student—without notice or an opportunity to opt out—in violation of their religious beliefs and her privacy. 2.App.397. That is both a *present* harm and a substantial risk of *future* harm—either of which establishes their standing. This issue will continue to recur as long as their daughter remains on her team (as she intends), or participates in any other overnight activities.

Yet the district court held the Perlmans "lack standing" because they have not "suffered an injury in fact." 3.App.689. That ruling is wrong for at least two reasons: 1) it misapplies the test for standing at the pleading stage; and 2) it fails to accept the facts as pleaded.

As for the test, the "burden in establishing standing is lightened considerably" at the pleading stage. *Cressman v. Thompson*, 719 F.3d 1139, 1144 (10th Cir. 2013) (citation modified). And when a constitutional right is at stake, courts apply the test leniently. *Ward v. Utah*, 321 F.3d 1263, 1266–67 (10th Cir. 2003). The Perlmans need only plead

allegations sufficient to meet the elements of injury, causation, and redressability. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014). They have.

Injury was the only element the district court said was not met. To satisfy it, "general factual allegations of injury" are enough. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). And courts are to "presume that general allegations embrace those specific facts that are necessary to support the claim." *Id.* (citation modified). Even "[a]n allegation of future injury" is enough if "there is a substantial risk that the harm will occur." *Susan B. Anthony List*, 573 U.S. at 158 (citation modified).

Here, the Perlmans allege facts that show both present harm and a substantial risk of future harm. 2.App.374–377, 395–397. As with the other plaintiffs—whose standing Jeffco did not dispute—the policy is "directly affect[ing]" their behavior now and again as each new trip is scheduled. *Sch. Dist. of Abington Twp.*, 374 U.S. at 224 n.9. So they have "a direct stake in the outcome" of this case. *Am. Humanist Ass'n, Inc. v. Douglas Cnty. Sch. Dist. RE-1*, 859 F.3d 1243, 1252 (10th Cir. 2017) (citation modified).

Presently, Jeffco's policy is forcing the Perlmans to make a "decision" about whether to exclude their daughter from fully partici-pating in a sport she loves or subject her to Jeffco's objectionable policy by sending her on overnight trips with her team—that choice "is itself a confrontation" with the policy sufficient for standing. *Freedom From*

*Religion Found., Inc. v. Mack*, 49 F.4th 941, 949–50 (5th Cir. 2022). And an injunction barring Jeffco from applying its policy to room their daughter with the opposite sex would directly redress that harm. It would also allow their daughter to continue to excel in basketball and grow in ways that cannot be replicated in the classroom. 2.App.375.

As for the substantial risk of future harm, the Perlmans detail their religious and privacy objections to their daughter sharing a bedroom or shower facility with opposite-sex students. *Id*. They describe how she plays on a team that "travels for tournaments that require overnight stays" subject to the policy. 2.App.376. They state that these "trips will begin to occur for her team" in the upcoming season and will continue as she participates in future seasons. 2.App.396. When the complaint was filed, she was playing varsity games as a freshman. She intends to continue playing as a sophomore this year, a junior next year, and a senior the following year. The Perlmans also allege that, per the policy, Jeffco will not notify them before it assigns her to share a hotel room with an opposite-sex student. *Id*. These allegations, taken as true, are more than enough to show a substantial risk of future harm.

Yet the district court said that allegations about future trips are not enough because they are not certain. 2.App.342–43, 3.App.689–90. But that is wrong for two reasons. First, the court must accept the facts pleaded as true under Rule 12. They were also verified as testimony supporting the motion for preliminary injunction. 1.App.129–38.

Second, as a matter of law, the Perlmans need not show a "literal[ ] certain[ty]" of future harm. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013). Nor must they expose their daughter to an opposite-sex roommate to challenge a policy that deters "the exercise of [their] constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974).

*Mahmoud* cements this point. The court need not "wait and see" how a particular student will be roomed on a particular trip "before evaluating the parents' First Amendment claims." 606 U.S. at 560. It need only decide whether—if Jeffco follows its policy and rooms the Perlmans' daughter with an opposite-sex student—"a burden on religious exercise will occur." *Id*. It would. And that burden is greater because Jeffco "will not notify parents" or allow them to opt out of the policy ahead of time. *Id*. So the district court was wrong to conclude that the Perlmans lack standing.

## II.    Plaintiffs are likely to prove—and certainly state a claim— that Jeffco's policy violates their free-exercise rights.

At its core, the Free Exercise Clause protects "the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022). That includes parents who "direct the religious upbringing of their children" in government schools and students who live out their religious beliefs at school. *Mahmoud*, 606 U.S. at 546 (citation modified).

30

The Constitution gives free exercise "a generous measure of protection" that "extends to the choices . . . parents wish to make for their children outside the home" and "follow[s] [their] children into the public classroom." *Id*. at 547. Their rights are "not 'shed ... at the schoolhouse gate.'" *Id*. at 545 (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506–07 (1969)). And like all government bodies, Jeffco "may not place unconstitutional burdens on religious exercise." *Id*.

To secure this heightened protection, courts apply strict scrutiny to school policies that burden religious exercise in either of two ways. First, under *Mahmoud*, even a generally applicable policy triggers strict scrutiny if it "substantially interfere[s] with the religious development of the parents' children" or threatens to "undermin[e] the religious beliefs and practices that the parents wish to instill in their children." *Id*. at 565 (citation modified). Second, a policy triggers strict scrutiny if it burdens religious exercise and is not "neutral" or "generally applicable." *Fulton*, 593 U.S. at 533. Jeffco's policy triggers strict scrutiny for both these reasons.

Yet in dismissing plaintiffs' claims, the district court committed three reversible errors: (1) it completely ignored *Mahmoud*; (2) it mistakenly found Jeffco's policy to be neutral and generally applicable; and (3) it wrongly held that the policy satisfied strict scrutiny. Each

31

error warrants reversal. And because plaintiffs are likely to succeed on their free-exercise claims, a preliminary injunction is warranted.

### A.  Jeffco's policy triggers strict scrutiny under *Mahmoud*—a case the district court ignored.

Plaintiffs have argued from the outset that Jeffco's policy triggers strict scrutiny because it violates their right to direct their children's religious upbringing. 1.App.027–028 (relying on *Wisconsin v. Yoder,* 406 U.S. 205 (1972)). After *Mahmoud* reaffirmed *Yoder*—and while the parties' motions were pending—plaintiffs alerted the district court to *Mahmoud*'s dispositive effect. 3.App.678–79. But the court dismissed plaintiffs' free-exercise claims without even discussing *Mahmoud* or evaluating the facts as pleaded under its "fact-intensive" inquiry. 606 U.S. at 550. That was error.

Like the parents here, the *Mahmoud* parents "believe[d] that biological sex reflects divine creation, that sex and gender are inseparable, and that children should be encouraged to accept their sex and to live accordingly." *Id*. at 552; *see* 2.App.360–61, 369, 375, 379. The school district in *Mahmoud* refused to let those parents opt their children out of storybooks "designed to present the opposite viewpoint." *Mahmoud*, 606 U.S. at 551. The district "present[ed] as a settled matter a hotly contested view of sex and gender that sharply conflicts with the religious beliefs that the parents wish[ed] to instill in their children." *Id*. at 553.

32

Because "the books exert[ed] upon children a psychological pressure to conform to their specific viewpoints," the district "impose[d] upon children a set of values and beliefs that [we]re hostile to their parents' religious beliefs." *Id.* at 554 (citation modified). That was enough to trigger strict scrutiny because the books threatened to "undermin[e] the religious beliefs and practices that the parents wish[ed] to instill in their children." *Id.* at 565 (citation modified).

To determine whether a school policy imposes a *Mahmoud*-type burden, courts must consider the "specific religious beliefs and practices asserted," the age of the children, the "specific nature" of the require-ment at issue, and the context in which the requirement is imposed. *Id.* at 550. They are also to consider whether the requirement imposes a "pressure to conform" on students. *Id.*

All these factors are met here under Rule 12 and for the motion for preliminary injunction. Plaintiffs' complaint details the religious beliefs and practices parent-plaintiffs wish to instill in their children—that sex is binary and that their children should not share intimate spaces with the opposite sex regardless of their gender identity. 2.App.360–61, 369, 375, 379. It describes how Jeffco's policy allows school officials to room opposite-sex students at least as young as 11 together in hotel rooms and cabins. 2.App.365. It explains how Jeffco's policy requires students of the opposite sex to room together without notice or their parents' consent. 2.App.380–81. And all of that occurs in

33

the context of trips where the children are disconnected from their parents—either by hundreds of miles or by lack of communication. 2.App.366, 370.

What's more, it is likely—let alone plausible—that Jeffco's policy and refusal to accommodate students who object to rooming with the opposite sex imposes "a pressure to conform" to Jeffco's views on issues of sex, gender, and modesty. *Mahmoud*, 606 U.S. at 550. D.W. felt that pressure. 2.App.367. B.R. felt that pressure. 2.App.373. A.G.B. felt that pressure. 2.App.394. And every student who wants to participate in overnight activities with their teammates and classmates will feel that pressure. Because if they are not willing to conform, they will be excluded from participating in overnight activities.

But under *Mahmoud*, Jeffco cannot condition plaintiffs' equal participation in overnight activities on their "willingness to accept a burden on their religious exercise." *Id.* at 561. The unconstitutional conditions doctrine forbids Jeffco from coercing families into surrendering their rights. *Id.*; *accord Carson v. Makin*, 596 U.S. 767, 778–79 (2022); *see also Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245, 1258 (10th Cir. 2016) (holding "the government may not deny a benefit" to a plaintiff because they "exercise[] a constitutional right" (citation modified)). Here, Jeffco's policy leaves religious students only two choices: conform or forfeit participation in overnight activities. That coercion violates the Free Exercise Clause.

The *Mahmoud* violation is just as clear when considering the uncontradicted facts in the preliminary injunction record. Jeffco did not contest plaintiffs' evidence of their religious exercise. *See* 3.App.617–637. Nor did it contradict their sworn testimony about how rooming their children with the opposite sex would burden their religious exercise and undermine their children's religious upbringing. *Id.* Jeffco also didn't dispute that its policy allows school officials to room students of the opposite sex together without notice or parental consent. *Id.*

If subjecting students to storybooks burdens religious exercise, how much more so does forcing students to affirmatively act against their beliefs by rooming with the opposite sex? Because the district court failed to apply *Mahmoud*, this Court should reverse its dismissal of plaintiffs' free-exercise claims and denial of their motion for preliminary injunction.

## B.    Jeffco's policy triggers strict scrutiny because it is neither neutral nor generally applicable.

Neutrality and general applicability are "interrelated" and "failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 531 (1993). A policy is not generally applicable if it (1) allows for "individualized" accommodations or exemptions, or (2) "prohibits religious conduct while permitting secular conduct that undermines the

government's asserted interests in a similar way." *Fulton*, 593 U.S. at 533–34 (citation modified). Jeffco's policy does both.

On the first flaw—individualized exemptions—the policy expressly states that Jeffco considers whether to place students in overnight accommodations with the opposite sex on a "case-by-case basis" considering students' individualized circumstances and needs. 3.App.429. By definition, such a system is not generally applicable. *Lukumi*, 508 U.S. at 537–38. So Jeffco "may not refuse to extend that system to cases of 'religious hardship' without compelling reason." *Id.* at 537 (citation omitted). Yet that is what plaintiffs allege Jeffco has done. And these verified facts must not only be taken as true under Rule 12, but they should be "deemed admitted for preliminary injunction purposes" because Jeffco did not contradict them. *Hobby Lobby Stores, Inc.*, 723 F.3d at 1146.

Jeffco's policy also states that "[i]n *most* cases, students who are transgender should be assigned to share overnight accommodations with other students that share the student's gender identity consistently asserted at school." 3.App.429 (emphasis added). The policy gives officials unfettered discretion by failing to (1) direct how they should decide when to room opposite-sex students together or (2) define how "consistently asserted" a student's gender identity must be for the policy to apply. *Id*. So it is not generally applicable because it "invites" Jeffco

36

to consider the particular reasons why a student should be roomed with the opposite sex. *Fulton*, 593 U.S. at 533 (citation modified).

On the second flaw—prohibiting religious conduct while allowing comparable secular conduct—Jeffco does not accommodate religious students on equal terms as other students. In conflict with the language quoted in the prior paragraph, Jeffco's policy definitively declares that "[u]nder no circumstance shall a student who is transgender be required to share a room with students whose gender identity conflicts with their own." 3.App.429. Yet religious students who object to sharing rooms with the opposite sex receive no such accommodation and are effectively excluded from overnight activities. That unequal treatment "treats comparable secular activity more favorably than religious exercise" and thus triggers strict scrutiny. *Tandon v. Newsom*, 593 U.S. 61, 62 (2021); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458 (2017) (affirming that the Free Exercise Clause "protects religious observers against unequal treatment").

Turning from general applicability to neutrality, the Supreme Court has affirmed that the government "fails to act neutrally when it proceeds in a manner intolerant of religious beliefs." *Fulton*, 593 U.S. at 533. Religious intolerance can appear not only in the policy's text but in the way it is applied. *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 640 (2018). Here, plaintiffs' allegations create at least a "slight suspicion" of religious intolerance. *Lukumi*, 508 U.S. at 547;

37

*Masterpiece Cakeshop*, 584 U.S. at 638–39. Promising to accommodate the overnight accommodation requests of students who identify as transgender, while refusing to accommodate the requests of religious students like student-plaintiffs, gives rise to at least some suspicion of religious hostility. That suspicion is reinforced by Jeffco's decision to cut the accommodation language from the policy after the Waileses requested one.

These facts illustrate that Jeffco has done precisely what *Mahmoud* forbids. It has applied its policy in a manner that protects "one group of students from stigma and isolation by stigmatizing and isolating another." 606 U.S. at 568. The contrast is stark: Jeffco guarantees transgender-identifying students full participation in overnight activities, on the student's own terms, while denying the same to students with religious objections. 3.App.429. "It is difficult to see how affording extra privileges to the transgender student based on subjective feelings of discomfort while simultaneously excluding the non-transgender student for [their] feelings is something other than invidious discrimination." *Carroll Indep. Sch. Dist. v. U.S. Dep't of Educ.*, 741 F. Supp. 3d 515, 523 (N.D. Tex. 2024). For these reasons, plaintiffs are likely to prove that Jeffco's policy violates their free-exercise rights and is subject to strict scrutiny, which it fails. It was error for the district court to hold otherwise.

## C.    Jeffco's policy fails strict scrutiny.

Because the policy triggers strict scrutiny, Jeffco must satisfy that demanding standard. To do so, Jeffco must prove that applying its policy to plaintiffs "furthers a compelling governmental interest and is narrowly tailored to that end." *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015). But that test is ill suited for a motion to dismiss. Dismissal is "rarely, if ever, . . . appropriate at the pleading stage." *Jeffery v. City of New York*, 113 F.4th 176, 188 (2d Cir. 2024) (citation modified); *accord Finch v. Peterson*, 622 F.3d 725, 728 (7th Cir. 2010) (government's burden is "rarely carried at the pleadings stage").

Yet the district court claimed that Jeffco somehow carried its burden. That is wrong for several reasons. To start, *Mahmoud* defeats the strict scrutiny arguments Jeffco raised. Jeffco argued that rooming student-plaintiffs only with students of the same sex would risk "stigmatizing" transgender-identifying students. 3.App.524. But *Mahmoud* says that a school cannot claim a compelling interest in "rescu[ing] one group of students from stigma and isolation by stigmatizing and isolating another." 606 U.S. at 568.

Jeffco also raised administrability concerns, but those were contradicted by the allegations of the complaint, 2.App.383–386, which the court was to accept as true. Jeffco *already* considers rooming decisions on a "case-by-case" basis. 2.App.429. So Jeffco's professed concerns "are a product of its own design." *Mahmoud,* 606 U.S. at 567.

If Jeffco can accommodate transgender students on trips and create
parental opt-outs and consent requirements for other activities (e.g.
giving a child Gatorade or cough drops), 2.App.389, Jeffco can likewise
accommodate plaintiffs' religious beliefs and privacy concerns. *Id*. And
it can do so without revealing anyone's gender identity. 3.App.582.

What's more, the question is not whether Jeffco has a compelling
interest generally but whether it has a compelling interest in applying
the policy to these plaintiffs. *See Fulton*, 593 U.S. at 541. But Jeffco
asserts only two general interests. First, it claims that "the policy
ensures that all students can fully participate" because "[i]nclusive
schools benefit all students." 3.App.523. Second, it claims an interest in
"avoiding the real and meaningful harms to its transgender students."
*Id*. But Jeffco's application of its policy to plaintiffs does not further
these general interests.

As to Jeffco's interest in ensuring "all students can fully
participate in its education," 3.App.523, its treatment of student-
plaintiffs undermines it. Jeffco refused plaintiffs' "requests to provide
an equal accommodation that allows full participation prior to trips."
2.App.402. For example, the only option Jeffco gave the Brinkmans
excluded their daughter from overnight activities and required them to
pick her up late every night and drop her off early every morning.
3.App.575. That was not an accommodation but a penalty that forced

A.G.B. to miss half the Outdoor Lab experience and ostracized her from her classmates. *Id.*

And as for Jeffco's interest in protecting transgender-identifying students, the accommodations that plaintiffs request pose no harm to those students and would not exclude them from equal participation. 2.App.386. Nor would plaintiffs' accommodations require Jeffco to reveal any student's sex or gender identity. *Id.* Jeffco can still room transgender-identifying students with students who share their gender identity—just not with student-plaintiffs. *Id.*

For similar reasons, Jeffco's actions are not narrowly tailored because it could pursue less restrictive alternatives. *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 823 (2000). For example, Jeffco could allow all parents to choose whether their children will be roomed by gender identity or sex or assert they have no preference. 2.App.386. Then Jeffco could make the rooming assignments without parents or students knowing which students identify as transgender. This process would more effectively further Jeffco's interests because resolving these matters before a trip would avoid the uncomfortable on-the-spot situation experienced by D.W. and her male roommate. And given the small number of transgender-identifying students—and that many parents likely do not object to Jeffco's policy—accommodating student-plaintiffs will be easy and cause no harm to anyone. The existence of options like this proves Jeffco's policy is not narrowly tailored.

In sum, Jeffco's policy fails strict scrutiny because, based on the facts pleaded, Jeffco doesn't advance a compelling interest in a narrowly tailored manner. It was error for the district court to hold otherwise.

## III. Plaintiffs are likely to prove—and certainly state a claim—that Jeffco's policy violates their fundamental rights.

The Fourteenth Amendment prohibits state action that "abridge[s] the privileges or immunities of citizens of the United States" or "deprive[s] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. For over a century, the Supreme Court has repeatedly recognized that this Amendment "guarantees more than fair process"—it has a substantive component that "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Troxel*, 530 U.S. at 65 (plurality op.) (citation modified); *see, e.g.*, *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923); *accord Timken v. S. Denv. Cardiology Assocs., P.C.*, 155 F.4th 1227, 1238 (10th Cir. 2025) ("Due process comes in two forms, procedural and substantive.").

Government may not infringe "fundamental liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (citation modified). Although jurists and scholars debate which Fourteenth Amendment clause secures these "substantive rights," claims under either clause must be

rooted in this Nation's "history and tradition." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 240 n.22 (2022); *see* William Baude, Jud Campbell & Stephen E. Sachs, *General Law and the Fourteenth Amendment*, 76 Stan. L. Rev. 1185, 1252 (2024) (discussing the relationship between substantive due process and the Privileges or Immunities Clause).

Courts analyze such claims using a multi-step framework. *Dep't of State v. Muñoz*, 602 U.S. 899, 909–10 (2024). They start with "a careful description of the asserted fundamental liberty interest" to determine whether it is "deeply rooted in this Nation's history and tradition." *Id.* at 910 (citation modified). If it is, then it is protected under the Fourteenth Amendment. Next, courts ask whether the challenged government action "infringe[s]" that right. *Reno v. Flores*, 507 U.S. 292, 302 (1993); *see Foote v. Ludlow Sch. Comm.*, 128 F.4th 336, 349 (1st Cir. 2025) (per curiam) (finding plaintiffs had "adequately pled rights" and then asking whether the government school "actually restricted" those rights). If it does, strict scrutiny applies. *Muñoz*, 602 U.S. at 910–11.

Plaintiffs have pleaded strong claims that satisfy that framework. They assert two rights "deeply rooted" in the Nation's history and tradition: (1) parents' right to direct their children's upbringing, education, and care; and (2) students' right to bodily privacy. Jeffco's policy infringes both.

### A.   Parental rights are fundamental because they are deeply rooted in this Nation's history and tradition.

The parental right in directing the upbringing, education, and care of their children "is perhaps the oldest of the fundamental liberty interests recognized by" the Supreme Court. *Troxel*, 530 U.S. at 65 (plurality op.). The Due Process clause, "[w]ithout [a] doubt," protects that right. *Meyer*, 262 U.S. at 399. Parents' right "to raise their children without undue state interference is" not only "well established," *Gruenke v. Seip*, 225 F.3d 290, 303 (3d Cir. 2000), it is also "frequently enforced," *Lee v. Poudre Sch. Dist. R-1*, 135 F.4th 924, 937 (10th Cir. 2025) (McHugh, J., concurring).

This fundamental right is grounded in a foundational truth— "[t]he child is not the mere creature of the state." *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 535 (1925). "[T]he custody, care and nurture of the child reside first in the parents." *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944). So when it comes to "important decisions" concerning the child, parents are to have the preeminent "guiding role." *H.L. v. Matheson*, 450 U.S. 398, 410 (1981) (citation modified).

At common law, parents had "both the responsibility and the authority to guide their children's development and make important decisions on their behalf." Eric A DeGroff, *Parental Rights & Public School Curricula: Revisiting* Mozert *after 20 Years*, 38 J.L. & Educ. 83, 108 (2009). This right persisted even after public schooling became the

44

norm. *Id*. at 113. That's why when James Kent revised his
*Commentaries on American Law* in the mid-19th century to address
state-funded education, he chose to add that discussion to his chapter
on parental rights and duties. 2 James Kent, *Commentaries on
American Law* \*195–203 (5th ed. 1844), http://bit.ly/45PnVL8.

Public schools did not diminish parental rights. Rather, as Kent
explained, they were meant to help parents exercise their rights—and
fulfill their duty—to educate their children. *Id*. at \*201–02. At common
law, the schoolmaster served *in loco parentis* and possessed only such
authority as "the parent committed to his charge," 1 William Black-
stone, *Commentaries on the Laws of England* \*453 (10th ed. 1787),
http://bit.ly/3TNe01g. "'[I]n loco parentis' does not mean 'displace
parents.'" *Gruenke*, 225 F.3d at 307.

Yet that is what Jeffco's policy does. The district court character-
ized this case as one about parents trying to "oust the state's authority"
over curriculum. 3.App.690. That framing misunderstands both the
relief requested and the law. And it rests on three flawed assumptions:
1) that the decision whether a child should be roomed with the opposite
sex is "curricular"; 2) that public schools have exclusive authority over
that decision; and 3) that parents' fundamental right extends only to
removing their child from school.

As to the first, the district court claimed that plaintiffs are
asserting "a right to dictate Jeffco's curriculum" on "topics like a child's

gender identity, sexual modesty, and interactions with the opposite sex." 3.App.691–92. But that misstates their claim. Jeffco is free to teach what it wants on those topics. What it is not free to do is room student-plaintiffs with the opposite sex or pressure them to conform to Jeffco's views on those topics. *Mahmoud*, 606 U.S. at 554–56. Those choices belong to plaintiffs.

If Jeffco insists that it does serve an "educational" purpose— making it part of its curriculum as the district court held—then *Mahmoud* and *Yoder* apply with even greater force because they both reinforce parents' right to direct their child's religious upbringing. *Mahmoud*, 606 U.S. at 543–44 (reaffirming *Yoder*).

That is not to say that *Mahmoud* and *Yoder* only apply in cases involving "curricular" requirements. "To the contrary," they broadly protect against any policy—curricular or not—that imposes even "subtle forms of interference with the religious upbringing of children." *Id*. at 548; *see also Doe No.1 v. Bethel Loc. Sch. Dist. Bd. of Educ.,* No. 23-3740, 2025 WL 2453836, at *12 (6th Cir. Aug. 26, 2025) (Larsen, J., concurring) (explaining why it is wrong to limit *Mahmoud*'s reach to curricular requirements and highlighting "[a]ll sorts of non-curricular school rules" that "can interfere with parents' religious upbringing of their children").

As to the other two assumptions, *Mahmoud* rebuts them too. *Mahmoud* rejected the notion that parents have no say in what their

children are taught in public schools. 606 U.S. at 530. *Mahmoud* rejected the idea that the only alternative parents have to school policies that burden their rights is to remove their children from public schools. *Id.* at 560–62. The district court erred in reducing plaintiffs' options to that extremely burdensome and costly choice.

## B. Jeffco's policy infringes parent-plaintiffs' fundamental parental rights.

When parent-plaintiffs' claim is rightly framed, it is easy to see how Jeffco's policy infringes their fundamental rights to direct their children's upbringing, education, and care. The policy allows Jeffco to usurp parents' fundamental decision-making authority over whether their child will share intimate spaces—such as hotel rooms, cabins, or shower facilities—with the opposite sex. Parents have no say (or even advance notice) about whether their young children share a bed or undress in front of the opposite sex. Depriving parents of that authority "runs counter to the constitutional 'presumption that fit parents act in the best interests of their children.'" *Lee*, 135 F.4th at 936 (McHugh, J., concurring) (quoting *Troxel*, 530 U.S. at 68 (plurality op.)).

Unlike the parents in *Lee*, who—according to this Court—failed to show that a school policy was "the moving force of their alleged injury," 135 F.4th at 935, plaintiffs here allege in detail how Jeffco's policy was, is, and will remain the moving force behind their constitutional injuries. 2.App.398. As Judge McHugh's concurrence in *Lee* explains, a parent's

47

fundamental right is infringed by a school policy that "help[s] students keep their parents in the dark about their gender identities." 135 F.4th at 937. So does a policy of keeping parents in the dark about whether their child will be roomed with the opposite sex.

As alleged, Jeffco initially promised the Waileses, Rollers, and other parents that their children would be roomed with the same sex. 2.App.398. But Jeffco broke that promise. 2.App.365, 372. And it did so without notice or obtaining parents' consent. 2.App.395. These allegations, taken as true, more than state a claim that Jeffco's policy violates parent-plaintiffs' fundamental right to direct their children's upbringing, education, and care—they warrant injunctive relief.

Just as a law can't cede fit parents' authority over who visits their child, *Troxel*, 530 U.S. at 67 (plurality op.), a school policy can't cede parents' authority over who shares a bedroom or shower facility with their child. Parents have a right to make these important decisions. *Parham v. J.R.*, 442 U.S. 584, 602 (1979) (affirming parents' right to make "life's difficult decisions"). And when a policy, like Jeffco's, "come[s] into conflict with the fundamental right of parents to raise and nurture their child," "the primacy of the parents' authority must be recognized and should yield only where the school's action is tied to a compelling interest." *Gruenke*, 225 F.3d at 305; *see also Mirabelli v. Olson*, 691 F. Supp. 3d 1197, 1210-12 (S.D. Cal. 2023).

48

In short, because plaintiffs are likely to succeed on their claim that Jeffco's policy violates parent-plaintiffs' fundamental parental rights, this Court should reverse the district court and enjoin Jeffco from rooming student-plaintiffs with the opposite sex.

### C.    The right to bodily privacy is also fundamental.

Student-plaintiffs have a fundamental right to bodily privacy. Jeffco's policy concedes as much: "All persons, including students, have a right to privacy. . . ." 3.App.428. This Court has already recognized a "constitutional right to privacy" in one's unclothed body. *Cumbey v. Meachum*, 684 F.2d 712, 714 (10th Cir. 1982); *see Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1202 (10th Cir. 2003) (analyzing claim under the Fourth Amendment).

In *Cumbey*, this Court held that an inmate stated a "cognizable constitutional claim" that his right to privacy was violated by a prison policy that allowed female guards to watch him undress, use the restroom, and shower. 684 F.2d at 714. If "convicted prisoners," who do not enjoy "the full protection of the Constitution," are entitled to that protection, *id.*, much more so are young schoolchildren.

Yet the district court ignored *Cumbey* and ruled otherwise. It held that there "is no Fourteenth Amendment fundamental privacy right to avoid all risk of intimate exposure to or by a transgender person who was assigned the opposite biological sex at birth." 3.App.695 (citing

*Parents for Privacy v. Barr*, 949 F.3d 1210, 1217 (9th Cir. 2020)). But that ruling draws the right too narrowly. Plaintiffs do not assert a right to "avoid intimate exposure to or by a transgender person." Their right is to prevent intimate exposure to or by a person of the opposite sex—no matter their gender identity.

Beyond that, the district court disregarded how fundamental the right to privacy is in places where people undress, shower, and sleep. Courts have long recognized that everyone has a "constitutionally protected privacy interest in his or her partially clothed body." *Doe v. Luzerne Cnty.*, 660 F.3d 169, 175–76 & n.5 (3d Cir. 2011); *accord Canedy v. Boardman*, 16 F.3d 183, 185 (7th Cir. 1994) (affirming the "right to privacy is now firmly ensconced among the individual liberties protected by our Constitution"). This "reasonable expectation of privacy" exists "particularly while in the presence of members *of the opposite sex*." *Luzerne Cnty.*, 660 F.3d at 177 (emphasis added). That is because "[t]he two sexes are not fungible." *United States v. Virginia*, 518 U.S. 515, 533 (1996) (citation modified). For that reason, our nation has long secured "separate public restrooms for men and women based on privacy concerns." *Faulkner v. Jones*, 10 F.3d 226, 232 (4th Cir. 1993).

These privacy concerns are especially acute for children because bodily privacy is "central to their development and integrity." Samuel T. Summers, Jr., *Keeping Vermont's Public Libraries Safe*, 34 Vt. L. Rev. 655, 674 (2010) (citation modified). Forcing unsuspecting children to

share a bedroom or shower facility with the opposite sex risks their "permanent emotional impairment." *City of Phila. v. Pa. Hum. Rels. Comm'n*, 300 A.2d 97, 103 (Pa. Commw. Ct. 1973). And "the presence of unrelated" people of the opposite sex in areas "where intimate bodily functions take place is a cause of stress." *Torres v. Wis. Dep't of Health & Soc. Servs.*, 859 F.2d 1523, 1531 (7th Cir. 1988).

For these reasons, separating restrooms by sex has been common for centuries. *See Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 796 (11th Cir. 2022) (en banc) (noting separating school bathrooms based on sex is "unremarkable—and nearly universal"). As Justice Ginsburg wrote, "[s]eparate places to disrobe, sleep, [and] perform personal bodily functions are permitted, in some situations required, by regard for individual privacy." Ruth Bader Ginsburg, *The Fear of the Equal Rights Amendment*, Wash. Post at A21 (Apr. 7, 1975). The same is true here. The district court erred by effectively limiting the constitutional right to bodily privacy to the inside of a stall or confines of a single bunk, 3.App.695,—overlooking that the right has always more broadly protected against involuntary exposure in places like bedrooms and bathrooms, where personal privacy is no less at stake.

### D.   Jeffco's policy infringes student-plaintiffs' fundamental right to bodily privacy.

Following its policy, Jeffco assigned a male to share a hotel room with an unsuspecting eleven-year-old girl—without notice or her

51

parents' consent. 2.App.363–365. Likewise, it assigned a female to share a cabin with an eleven-year-old boy and monitor his showers—without notice or his parents' consent. 2.App.371–373. The lack of notice or consent is a feature—not a bug—of Jeffco's policy. What's more, Jeffco tells students and their parents that boys and girls will have separate places to disrobe, sleep, and perform personal bodily functions on overnight trips. But under its policy, Jeffco officials assign students of the opposite sex to those spaces. Taken as true, these allegations are more than enough to state a claim that Jeffco's policy infringes student-plaintiffs' right to bodily privacy.

Yet the district court dismissed their claim by relying primarily on *Parents for Privacy*, 949 F.3d 1210. In that case, the court upheld a school's policy because the school "provide[d] alternative options and privacy protections to those who d[id] not want to share facilities with a transgender student[.]" *Id*. at 1225. Unlike Jeffco, the school did *not* assign students to share facilities with the opposite sex without notice or keep parents from making that decision for their children. Rather, it freely provided alternative facilities that gave students the privacy they needed without denying them full participation in the educational benefits the school offered. *Id*. That is what plaintiffs seek here.

Yet Jeffco's policy is the opposite. Behind Jeffco's misleading promise of sex-separate spaces, it forces parents to surrender their constitutional rights or their child's educational opportunities and

expectation of privacy. Jeffco has not offered student-plaintiffs any no-cost alternatives that would allow them to fully participate in overnight activities with their classmates and teammates while avoiding the risk of sharing a bedroom or shower facility with the opposite sex.

For Outdoor Lab in particular, Jeffco's only solution is to exclude students from overnight activities if they or their parents object to them rooming with the opposite sex. And just as Jeffco can accommodate the privacy concerns and preferences of students who identify as transgender, it can do the same for student-plaintiffs too. So it was error for the court to rely on the Ninth Circuit's decision in *Parents for Privacy*.

## IV. A preliminary injunction is warranted and necessary to stop ongoing irreparable harm.

To obtain a preliminary injunction, plaintiffs must show: (1) a likelihood of success on the merits; (2) a likely threat of irreparable harm; (3) the balance of equities weighs in their favor; and (4) the injunction is in the public interest. *Mahmoud*, 606 U.S. at 546. The likelihood of success factor is usually "determinative" when the exercise of a constitutional right is at stake. *Hobby Lobby Stores, Inc.,* 723 F.3d at 1145 (citation modified). This is so for at least three reasons. First, the loss of a constitutional right—even for a short time—is irreparable harm. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1190 (10th Cir. 2003). Second, the government's interest in the enforcement of a likely unconstitutional policy does not outweigh a party's interest in having

their "constitutional rights protected." *Awad v. Ziriax*, 670 F.3d 1111, 1131–32 (10th Cir. 2012). And third, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* at 1132 (citation omitted). Plaintiffs' likelihood of success is determinative here.

The district court denied plaintiffs' renewed motion for preliminary injunction because it held that plaintiffs were not likely to succeed on any of their claims and would thus not suffer irreparable harm. 3.App.703–04. The law and record say otherwise.

### A.   Plaintiffs have likelihood of success on the merits.

Plaintiffs are likely to succeed on the merits because Jeffco's policy burdens their religious exercise, *supra* p. 30–38, infringes parent-plaintiffs' right to direct their children's religious upbringing and care, *supra* p. 42–48, and violates student-plaintiffs' right to bodily privacy, *supra* p. 49–53. Any of these infringements trigger strict scrutiny—which Jeffco fails. *Supra* p. 39 –41. So this factor weighs dispositively in plaintiffs' favor.

### B.   Because plaintiffs are likely to prevail on the merits, the remaining factors also weigh in their favor.

First, plaintiffs easily satisfy the irreparable harm requirement. As mentioned, the loss of constitutional rights—even for a short time—is irreparable harm. *Heideman*, 348 F.3d at 1190. Because plaintiffs have demonstrated multiple ongoing constitutional violations, they are enduring irreparable injuries. In addition, student-plaintiffs are

missing out on formative educational and athletic opportunities. They'll never get those opportunities again. That too is irreparable harm.

Second, the balance of equities favors plaintiffs. Jeffco's interest in enforcing its policy does not outweigh plaintiffs' interest in having their "constitutional rights protected." *Awad*, 670 F.3d at 1131–32. In fact, Jeffco's asserted interest in providing "equal education opportunities" for its students is actually furthered—not hindered—by accommodating student-plaintiffs on overnight trips.

That's because Jeffco's refusal to accommodate student-plaintiffs is forcing them to miss out on unique and valuable educational and athletic opportunities that these overnight trips provide. On the flip side, accommodating plaintiffs' requests won't take any opportunities away from any other students.

Third, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Id*. at 1132 (citation omitted). And all students deserve the equal opportunity to participate in overnight trips with their classmates.

## CONCLUSION

The Court should reverse the district court, remand for further proceedings, and order the district court to enjoin Jeffco from rooming student-plaintiffs with the opposite sex on any upcoming trips.

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs request oral argument. This case raises important constitutional questions under the First and Fourteenth Amendments: Can public schools assign children to share overnight accommodations with students of the opposite sex on overnight trips without parental notice or consent? Can those schools condition the benefit of these trips on parents' and students' willingness to accept a burden on their religious exercise or to give up bodily privacy? Do children have the right to bodily privacy in bedrooms and shower facilities when they attend overnight school trips?

Oral argument would help the Court resolve these questions.

Dated: November 19, 2025

Respectfully submitted,

*s/Noel W. Sterett*

John J. Bursch
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

Katherine L. Anderson
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
kanderson@ADFlegal.org

Noel W. Sterett
Mallory B. Sleight
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
nsterett@ADFlegal.org
msleight@ADFlegal.org

David A. Cortman
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road N.E.
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
dcortman@ADFlegal.org

*Counsel for Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,621 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Word 365 using a proportionally spaced typeface, 14-point Century Schoolbook.

Dated: November 19, 2025

*s/Noel W. Sterett*
Noel W. Sterett
*Counsel for Appellants*

**CERTIFICATE OF DIGITAL SUBMISSION**

I hereby certify that with respect to the foregoing:

(1) all required privacy redactions have been made per 10th Cir. R. 25.5;

(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Cortex XDR, Agent version 8.8.1, and according to the program are free of viruses.

*s/Noel W. Sterett*
Noel W. Sterett
*Counsel for Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on November 19, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

*s/Noel W. Sterett*
Noel W. Sterett
*Counsel for Appellants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Regina M. Rodriguez**

Civil Action No. 1:24-cv-02439-RMR-NRN

JOSEPH and SERENA WAILES, et al.,

      Plaintiffs,

v.

JEFFERSON COUNTY PUBLIC SCHOOLS and
JEFFERSON COUNTY PUBLIC SCHOOLS
BOARD OF EDUCATION,

      Defendants.

---

**ORDER**

---

    This matter is before the Court on Defendants' Motion to Dismiss Plaintiffs' Amended Complaint, ECF No. 41, and Plaintiffs' Renewed Motion for Preliminary Injunction, ECF No. 48. The Motions are fully briefed and ripe for review. For the reasons set forth below, Defendants' Motion to Dismiss Plaintiffs' Amended Complaint is GRANTED and Plaintiffs' Renewed Motion for Preliminary Injunction is DENIED.[1]

---

[1] Given the Court's ruling dismissing the Amended Complaint with prejudice, the Court determines that an evidentiary hearing is unnecessary before ruling on Plaintiffs' Renewed Motion for Preliminary Injunction. *See Reynolds & Reynolds Co. v. Eaves*, 149 F.3d 1191, 1998 WL 339465, at *3 (10th Cir.1998) ("[Plaintiff] has failed to cite any Tenth Circuit authority that requires a district court to hold an evidentiary hearing prior to granting or denying a preliminary injunction motion . . . . Accordingly, we do not instruct the district court to hold an evidentiary hearing prior to disposition of [Plaintiff's] motion, although the district court is free to do so within its own discretion.").

## I.    BACKGROUND

This Court continues to acknowledge the importance of addressing disputes between parents and public schools in a manner that recognizes the parents' sincere and natural desire to protect their children and public schools' obligation to provide a free and fair education while protecting the rights of all students. The Court incorporates herein the background facts of this case, including its discussion of Jefferson County Public Schools' ("Jeffco") policy, as stated in its prior Order denying Plaintiffs' Motion for Preliminary Injunction. *See* ECF No. 33 at 1–4.

A month after the Court's Order, Plaintiffs filed an Amended Complaint, ECF No. 36, and two months after that, a Renewed Motion for Preliminary Injunction, ECF No. 48. Plaintiffs Daniel and Annette Brinkman and their children, A.G.B. and A.D.B. by and through their parents, joined the lawsuit. Other than this, the main factual difference between the Court's prior Order and now is that all "upcoming trips" previously discussed have already happened. *See* ECF No. 33 at 4. There is also some disagreement between the parties about the reasonableness of the accommodations offered for some of these trips, *compare* ECF No. 48 at 6–8 *with* ECF No. 50 at 7–8, but the fact remains that accommodations were offered and utilized per Jeffco's policy.[2] For example, the Brinkman Plaintiffs chose the option of having their child participate in Outdoor Lab as a day student. *See* ECF No. 36, Am. Compl. ¶¶ 341-42, 368.

---

[2] Regardless of the factual dispute between the parties about the reasonableness of accommodations in the renewed preliminary injunction briefing, the Court's findings with respect to Defendants' Motion to Dismiss Plaintiffs' Amended Complaint for failure to state a claim renders the dispute moot.

A002

## II.    LEGAL STANDARD

### A.    Motion to Dismiss

#### 1.    Federal Rule of Civil Procedure 12(b)(1)

Under Federal Rule of Civil Procedure 12(b)(1), a court may dismiss a complaint for lack of standing. *Grace Bible Fellowship v. Polis*, No. 23-1148, 2024 WL 1340201, at *2−5 (10th Cir. Mar. 29, 2024). A plaintiff bears the burden of demonstrating standing for each form of relief sought. *W. Watersheds Project v. Interior Bd. of Land Appeals*, 62 F.4th 1293, 1296−97 (10th Cir. 2023).

"[T]he irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks and citations omitted). A "theory of standing" that "relies on a highly attenuated chain of possibilities, does not satisfy the requirement that threatened injury must be certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013) (citations omitted).

"Second, there must be a causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560 (citation omitted). "Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561 (internal quotation marks and citation omitted); *see also Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) ("The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be

A003

redressed by a favorable judicial decision.") (citations omitted). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561; *see also Spokeo*, 578 U.S. at 338.

### 2.    Federal Rule of Civil Procedure 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a complaint must be dismissed when a plaintiff's allegations fail to put forth a set of facts that, if true, would entitle the complainant to relief. *See Ash Creek Mining Co. v. Lujan*, 969 F.2d 868, 870 (10th Cir. 1992); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level."); *Ashcroft v. Iqbal*, 556 U.S. 662, 678−79 (2009) (holding that a claim must be facially plausible in order to survive a motion to dismiss). In deciding a motion under Rule 12(b)(6), the court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124−25 (10th Cir. 2010) (quoting *Smith v. U.S.*, 561 F.3d 1090, 1098 (10th Cir. 2009)). However, the court is not required to accept as true legal conclusions couched as factual allegations. *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

### B.    Preliminary Injunction

"A preliminary injunction is an extraordinary remedy, the exception rather than the rule." *Aposhian v. Barr*, 958 F.3d 969, 978 (10th Cir. 2020), *abrogated on other grounds by Garland v. Cargill*, 602 U.S. 406 (2024) (quoting *United States ex rel. Citizen Band*

**A004**

*Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888 (10th Cir. 1989)). "To obtain a preliminary injunction, the movant must show: (1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harms that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Id.* (quoting *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007)); *accord Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "It is the movant's burden to establish that each of these factors tips in his or her favor." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188−89 (10th Cir. 2003) (citation omitted).

### III.    ANALYSIS

#### A.    Plaintiffs Robert and Jade Perlman and their child, M.P., lack standing

Plaintiffs Robert and Jade Perlman and their child, M.P., (collectively, the "Perlmans") lack standing to assert any of the claims pled in this case. In order to have standing, Plaintiffs must have suffered an injury in fact. Here, the Perlmans have not alleged any past injuries and cannot show that any alleged future injury is certainly impending or that there is a substantial risk injury will occur. Instead, the Perlmans argue that M.P. "has been told by the coach that she will also play some varsity games" and "[t]he team travels for tournaments that require overnight stays." ECF No. 36, Am. Compl. ¶ 222. The Perlmans fail to allege that any overnight trips occurred or that M.P. was allegedly injured on any trips and, as already ruled by this Court, potential overnight stays next school year are not sufficient to allege a future injury that is certainly impending or

5

**A005**

that has a substantial risk of occurrence. *See* ECF No. 33 at 7−8. Therefore, the Perlmans have not alleged anything new in the Amended Complaint that remedies their previous standing issues and are dismissed from this case for lack of standing.

**B.   The remaining Plaintiffs' claims are dismissed with prejudice**

The remaining Plaintiffs'[3] claims are dismissed with prejudice[4] pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. While parents may have the right to instill moral and religious values in their children, parents have no right to replace public education with their own personal views nor a right to control each and every aspect of their children's education and oust the state's authority over that subject.

**1.   Substantive Due Process Claims (Counts I and III)**

**a.   *Count I - Fourteenth Amendment parental right to direct the care, education, and upbringing of their children***

The Fourteenth Amendment's Due Process Clause "specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (internal quotation marks and citations omitted). The Supreme Court has held that one such fundamental liberty interest protected by the Due Process Clause of

---

[3] Defendants did not challenge the remaining Plaintiffs' standing. *See* ECF No. 41 at 9−11.

[4] The Court finds that because Plaintiffs fail to state a claim in their Amended Complaint as explained in this Analysis Section III.B., Plaintiffs' complaint cannot be saved by further amendment, and granting leave to amend a second time would therefore be futile. Thus, the Court dismisses Plaintiffs' claims with prejudice. *See Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Inv'r's Servs., Inc.*, 175 F.3d 848, 859 (10th Cir. 1999) ("Although Fed. R. Civ. P. 15(a) provides that leave to amend shall be given freely, the district court may deny leave to amend where amendment would be futile."); *see also Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006) ("A dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) and granting leave to amend would be futile.").

the Fourteenth Amendment is "the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000); *see also Lee v. Poudre Sch. Dist. R-1*, 135 F.4th 924, 933 (10th Cir. 2025); *Parents for Privacy v. Barr*, 949 F.3d 1210, 1222−23, 1229 (9th Cir. 2020), *cert. denied* 141 S. Ct. 894 (2020); *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1204−05 (9th Cir. 2005). Among other things, this right means that

> the state cannot prevent parents from choosing a specific educational program—whether it be religious instruction at a private school or instruction in a foreign language. That is, the state does not have the power to "standardize its children" or "foster a homogenous people" by completely foreclosing the opportunity of individuals and groups to choose a different path of education.

*Fields*, 427 F.3d at 1205 (quoting *Brown v. Hot, Sexy & Safer Prods., Inc.*, 68 F.3d 525, 533−34 (1st Cir. 1995) (upholding compulsory high school sex education assembly program)); *see also Barr*, 949 F.3d at 1229.

This freedom, however, does not "encompass[ ] a fundamental constitutional right to dictate the curriculum at the public school to which [parents] have chosen to send their children." *Barr*, 949 F.3d at 1229 (quoting *Fields*, 427 F.3d at 1205); *see also Fields*, 427 F.3d at 1209 (holding that "neither education itself nor the legitimate functions of a public school are limited to the curriculum . . . . Such a view construes too narrowly the aims of education and fails to recognize the unique role that it plays in American society"). It is unclear whether Plaintiffs are seeking to change or eliminate the Jeffco policy,[5] but regardless, the case law precludes their right to do so.

---

[5] The Court pointed out in its previous Order denying Plaintiffs' original motion for a preliminary injunction, "Plaintiffs specifically represent that this narrow request 'does not ask this Court to order [Jeffco] to

**A007**

As the Tenth Circuit explained:

> But the scope of that right has limits. For example, parents have no right to "replace state educational requirements with their own idiosyncratic views of what knowledge a child needs to be a productive and happy member of society[.]" *Runyon v. McCrary*, 427 U.S. 160, 177 (1976) (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 239 (1972) (White, J., concurring)). And our court has ruled that a parent doesn't have "a constitutional right to control each and every aspect of their children's education and oust the state's authority over that subject." *Swanson ex rel. Swanson v. Guthrie Indep. Sch. Dist. No. I-L*, 135 F.3d 694, 699 (10th Cir. 1998).

*Lee*, 135 F.4th at 933.

In the First Count of their Amended Complaint, Plaintiffs specifically allege that their parental right includes "the right to instill moral and religious values in their children on topics like a child's identity as a male or female, a child's bodily privacy, sexual modesty, and interactions with the opposite sex." ECF No. 36, Am. Compl. ¶ 419. Plaintiffs further argue that their parental right includes "the right to protect their children from violation of their bodily privacy by exposure to the opposite sex in intimate settings, like overnight accommodations and shower facilities." *Id.* ¶ 420. Plaintiffs also argue that it includes "the right to determine (1) whether their children should expose, or risk exposing, their bodies or intimate activities to the opposite sex, and (2) whether their children should be exposed, or risk being exposed, to the bodies or intimate activities of the opposite sex." *Id.* ¶ 421.

Courts that have addressed transgender students' access to school bathrooms and locker rooms, which are analogous to bunkhouses and hotel rooms, have roundly

---

change their district-wide policy . . . .'" ECF No. 33 at 2 (quoting ECF No. 21 at 1, Pls.' Resp. in Opp. to Defs.' Emergency Mot. for Limited Expedited Discovery). Plaintiffs do not appear to explicitly limit their request for relief as such in their Amended Complaint (ECF No. 36) or their Renewed Motion for Preliminary Injunction (ECF No. 48).

A008

rejected that there is a fundamental parental right at issue. *See Barr*, 949 F.3d at 1229−32 (explaining that parents' right to direct their children's upbringing and education meant that the parent plaintiffs "ha[d] a right to remove their children from [the school] if they disapprove of transgender student access to facilities," but it did not include a right "to direct school administration more generally" or to direct the school's bathroom and locker room policy); *see also*, *e.g.*, *Doe No. 1 v. Bethel Local Sch. Dist. Bd. of Educ.*, No. 3:22-cv-337, 2023 WL 5018511, at *11−14 (S.D. Ohio Aug. 7, 2023), *appeal pending*, No. 23-3740 (6th Cir.).

Thus, while parents may have the right to instill moral and religious values in their children on topics like a child's gender identity, sexual modesty, and interactions with the opposite sex at home, they have no right to dictate Jeffco's curriculum around these issues and its efforts to ensure that transgender students are part of an educational environment where all students feel safe and ready to learn. Nothing about Jeffco's policy prohibits parents from teaching their children certain values. As held by the Tenth Circuit, parents have no right to replace public education with their own personal views nor a right to control each and every aspect of their children's education and oust the state's authority over that subject. *See Lee*, 135 F.4th at 933. Further, in Colorado District Court, Judge Nina Y. Wang and Magistrate Judge N. Reid Neureiter have similarly disposed of parental rights claims when parents have challenged school districts' LGBTQ-inclusive policies. *Lee v. Poudre Sch. Dist.*, No. 23-cv-1117-NYW-STV, 2023 WL 8780860, at *4−12 (D. Colo. Dec. 19, 2023); *Jones v. Boulder Valley Sch. Dist. RE-2*, No. 20-cv-3399-RM-NRN, 2021 WL 5264188, at *11−22 (D. Colo. Oct. 4, 2021).

**A009**

Requiring implementation of Plaintiffs' views on sex and gender identity at Jeffco at the expense of making a transgender student feel unsafe or unwelcomed in an educational environment falls outside the fundamental right to direct the care and upbringing of one's child. Moreover, Plaintiffs have the option under the Jeffco policy to coordinate alternative accommodations that would make their children feel more comfortable, if their children indeed share the beliefs of their parents about sex and gender identity. The Jeffco policy does not only offer accommodations for transgender students, as Plaintiffs allege.[6]

The Court therefore concludes that Plaintiffs have failed to state a claim under Federal Rule of Civil Procedure 12(b)(6) and dismisses Count I with prejudice.

### b. Count III - Fourteenth Amendment student right to bodily privacy

"The Supreme Court has recognized that 'one aspect of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment is 'a right of personal privacy, or a guarantee of certain areas or zones of privacy.'" *Barr*, 949 F.3d at 1222 (quoting *Carey v. Population Servs. Int'l*, 431 U.S. 678, 684 (1977)). "This right includes 'at least two constitutionally protected privacy interests: the right to control the disclosure of sensitive

---

[6] Though courts generally only consider facts alleged in the complaint in assessing the complaint's sufficiency, it is, on occasion, proper to look beyond the complaint. *Emps.' Ret. Sys. of R.I. v. Williams Cos., Inc.*, 889 F.3d 1153, 1158 (10th Cir. 2018). A court "may consider 'documents that the complaint incorporates by reference,' 'documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity,' and 'matters of which a court may take judicial notice.'" *Id.* (quoting *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010)); *see also Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002). Here, the Court considers documents attached as exhibits to the Amended Complaint because the Amended Complaint refers to them, they are central to Plaintiffs' claims, and Jeffco does not dispute their authenticity. *See, e.g.*, ECF No. 36, Am. Compl. ¶ 261 (citing and linking to Jeffco's policy, Ex. A to Am. Compl.).

**A010**

information and the right to 'independence [in] making certain kinds of important decisions.'" *Id.* (citing *Fields*, 427 F.3d at 1207 (quoting *Whalen v. Roe*, 429 U.S. 589, 599–600 (1977); citing *Marsh v. Cnty. of San Diego*, 680 F.3d 1148, 1153 (9th Cir. 2012)). However, there is no Fourteenth Amendment fundamental privacy right to avoid all risk of intimate exposure to or by a transgender person who was assigned the opposite biological sex at birth. *Barr*, 949 F.3d at 1217.

As explained in *Parents for Privacy v. Barr*, there is no support in the case law that

students have a fundamental right not to share restrooms and locker rooms with transgender students who have a different assigned sex than theirs . . . [t]hus, because [t]he potential threat that a high school student might see or be seen by someone of the opposition biological sex while either are undressing or performing bodily functions in a restroom, shower, or locker room does not give rise to a constitutional violation, . . . [and] Plaintiffs failed to state a claim for violation of the Fourteenth Amendment.

949 F.3d at 1223 (internal quotation marks and citations omitted).[7]

In their Third Count of the Amended Complaint, Plaintiffs specifically allege that their children have the right of bodily privacy to be protected from exposing their bodies "or intimate activities" to the opposite sex and, in turn, from being exposed to the body or "intimate activities" of the opposite sex. ECF No. 36, Am. Compl. ¶¶ 499−500. Plaintiffs further allege, "[a] government that compels its citizens to disrobe or attend the intimate

---

[7] By way of contrast in other privacy cases, the Ninth Circuit in *York v. Story*, 324 F.2d 450, 452 (9th Cir. 1963), determined that a male police officer violated a female victim's right to bodily privacy by taking unnecessary nude photographs of her in provocative positions and circulating them to other officers. Similarly, the Ninth Circuit in *Sepulveda v. Ramirez*, 967 F.2d 1413, 1415 (9th Cir. 1992), determined that a male parole officer violated a female parolee's right to bodily privacy by entering her bathroom stall over her objections and remaining in the stall while she finished urinating, cleaned herself, and dressed. In this case, Plaintiffs do not allege that anyone is taking nude photographs of their children or are taking overt steps to invade their bodily privacy.

activities in the presence of the opposite sex" violates their children's sense of self-respect and personal dignity. *Id.* ¶¶ 501−02. However, this mischaracterizes Jeffco's policy. It does not require anyone to disrobe in front of anyone else. Nor does it even require that Plaintiffs be in the restroom at the same time as other students, such as is the case with locker rooms in school gyms.

Jeffco affords Outdoor Lab participants privacy in the bunkhouses. Students sleep in single-occupancy bunks. *See* ECF No. 36-3 at 11−13, Am. Compl., Ex. C; ECF No. 32 at 24, Pls.' Supp. Appx. at 22.[8] The bunkhouses have private changing spaces. *Id.* Restroom and shower stalls are single-occupancy and have doors or thick, long privacy curtains. ECF No. 36-3 at 14, Am. Compl., Ex. C; ECF No. 32 at 24, Pls.' Supp. Appx. at 22. Therefore, the Outdoor Lab goes even further in the way of privacy than school bathrooms and locker rooms, for which courts have found that students do *not* have a fundamental right to privacy. Put plainly, Plaintiffs' children are neither being exposed to transgender students or counselors nor are they exposing themselves to transgender students or counselors. And if these arrangements are not satisfactory for any reason, students are not required to stay overnight; they can attend as day students. Indeed, the Brinkman Plaintiffs requested and received this option. *See* ECF No. 36, Am. Compl. ¶¶ 341−42, 368.

---

[8] For the same reasons articulated in *supra* fn. 6, the Court considers certain documents in Plaintiffs' originally filed Appendix (ECF No. 15-1) to their original Motion for Preliminary Injunction, Plaintiffs' Supplemental Appendix (ECF No. 32) to their Reply in Support of their original Motion for Preliminary Injunction, and Plaintiffs' Appendix (ECF No. 48-1) to their Renewed Motion for Preliminary Injunction. Further, the Amended Complaint describes letters Plaintiffs' counsel exchanged with Jeffco. Am. Compl. ¶¶ 287-98. Those letters are in Plaintiffs' Supplemental Appendix (ECF No. 32) and the Court may properly consider them.

A012

Additionally, Plaintiffs assume someone at Jeffco, or anyone else for that matter, would have knowledge in each instance of a student's sex or gender assigned at birth. This is inconsistent with Colorado law. Contrary to Plaintiffs' suggestions, Jeffco does not knowingly assign students of different sexes assigned at birth to share a bed. ECF No. 32 at 14, Pls.' Supp. Appx. at 12. And Jeffco does not necessarily know the sex assigned at birth of every student. While Jeffco maintains a record of each student's "legal gender," *id.* at 23−24, a family can have a student's legal gender changed under state law and have a new birth certificate issued, *id.* at 23 (citing C.R.S. § 25-2-113.8(3)(a)).

The Court therefore concludes that Plaintiffs have failed to state a claim under Federal Rule of Civil Procedure 12(b)(6) and dismisses Count III with prejudice.

### 2. First Amendment Free Exercise Claims (Counts II and IV)

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ...." U.S. Const., amend. I. "The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 877 (1990), *superseded by statute in other contexts as stated in Holt v. Hobbs*, 574 U.S. 352, 356−57 (2015). The Supreme Court has explained that "the First Amendment obviously excludes all 'governmental regulation of religious *beliefs* as such,'" meaning that "[t]he government may not compel affirmation of religious belief, punish the expression of religious doctrines it believes to be false, impose special disabilities on the basis of religious views or religious status, or lend its power to one or the other side in

A013

controversies over religious authority or dogma." *Id.* (emphasis in original) (citations omitted).

The Supreme Court has also suggested that the government would interfere with the free exercise of religion impermissibly if it sought to ban the performance of or abstention from certain physical acts, but "only when [those acts] are engaged in for religious reasons, or only because of the religious belief that they display." *Id.* Nevertheless, the "freedom to act" pursuant to one's religious beliefs "cannot be" absolute; "[c]onduct remains subject to regulation for the protection of society." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1128 (9th Cir. 2009) (citing *Cantwell v. Connecticut*, 310 U.S. 296, 303–04 (1940)). Thus, "[t]he right to freely exercise one's religion . . . does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his [or her] religion prescribes (or proscribes)." *Id.* at 1127 (internal quotation marks and citations omitted).

In Count II, Parent Plaintiffs claim that they "have a sincere religious belief that they must teach their children to practice modesty and protect their children's modesty[, which] requires that their children not undress, use the restroom, shower, complete other intimate activities, or share overnight accommodations with any non-family member of the opposite sex." ECF No. 36, Am. Compl. ¶ 462. They also allege that they "believe that a person's sex is binary and fixed at conception" and "do not believe people can change their sex." *Id.* ¶ 464. In Count IV, Student Plaintiffs claim that they have "sincerely held religious beliefs [which] require them to avoid intimate exposure, or the risk of intimate

A014

exposure, to the body or intimate activities of someone of the opposite sex." *Id.* ¶ 533. They allege their "beliefs require that they not undress, use the restroom, shower, complete other intimate activities, or share overnight accommodations with the opposite sex." *Id.* ¶ 534.

"[N]eutral, generally applicable laws that incidentally burden the exercise of religion usually do not violate the Free Exercise Clause of the First Amendment because they need only be rationally related to a legitimate government interest." *Barr*, 949 F.3d at 1234 (internal quotation marks and citations omitted). "[N]eutrality and general applicability are considered with respect to religion rather than with respect to the person or groups to which the law most directly pertains." *Id.* (internal quotation marks and citations omitted).

In this case, Jeffco's policy is neutral and generally applicable with respect to religion and, therefore, does not violate Plaintiffs' First Amendment rights. It does not force any Plaintiff to embrace a religious belief and does not punish anyone for expressing their religious beliefs. Moreover, it does not "proceed[ ] in a manner intolerant of religious beliefs or restrict[ ] practices because of their religious nature." *Fulton v. City of Philadelphia, Pa.*, 593 U.S. 522, 533 (2021) (citations omitted). Further, it applies to all students,[9] does not require Jeffco to "consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions" and does not "prohibit[]

---

[9] Jeffco's policy is even more obviously generally applicable than the policy in *Students for Privacy v. Barr*. In *Barr*, the student safety plan itself stated that it was "created to support a transgender male expressing the right to access the boy's locker room at Dallas High School" and in "response to the threat of [federal] enforcement action." 949 F.3d at 1235. In this case, Jeffco's policy is designed "to foster an educational environment that is safe and free from discrimination for all students" and reflects state and federal law. ECF No. 36, Am. Compl., Ex. A at 1; ECF No. 32 at 14−16, Pls.' Supp. Appx. at 12−14.

A015

religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id*. at 533−34 (citations omitted).

In fact, Jeffco makes no reference to any religious practice, conduct, belief, or motivation whatsoever. *See Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1076 (9th Cir. 2015). Jeffco instead assigns overnight rooms based on a neutral policy and allows any student to request accommodations for any reason. Jeffco does not evaluate accommodation requests as worthy or give employees discretion to reject requests based on the reasons for the requests, making Jeffco's policy neutral and generally applicable. *See* ECF No. 36, Am. Compl. ¶¶ 342, 368 (two district leaders separately offering the Brinkman Plaintiffs daytime-only participation in Outdoor Lab in response to their concerns); *see also Legacy Church, Inc. v. Kunkel*, 472 F. Supp. 3d 926, 987 (D.N.M. 2020) (finding public health orders neutral and generally applicable in part because they did not allow for state officials' "subjective determinations or judgments regarding the genuineness or value of specific religious beliefs") (citation omitted).

Because Jeffco's policy is neutral and generally applicable, rational basis review applies. *Chiles v. Salazar*, 116 F.4th 1178, 1225 (10th Cir. 2024). Jeffco's policy is rationally related to a legitimate government purpose: fostering an educational environment where all students are safe and included so that they can learn. *See* ECF No. 36, Am. Compl., Ex. A. at 2; *Barr*, 949 F.3d at 1238 (finding a "legitimate purpose of protecting student safety and well-being, and eliminating discrimination on the basis of sex and transgender status").

A016

Even assuming that Jeffco's policy posed a risk of the alleged constitutional violations, which it does not, the Court finds that Jeffco's policy is narrowly tailored to satisfy strict scrutiny. For example, in *Doe by and through Doe v. Boyertown Area Sch. Dist.*, the Third Circuit recognized that cisgender plaintiffs may experience a certain level of stress due to transgender students' presence in school facilities, but that stress was not "comparable to the plight of transgender students who are not allowed to use facilities consistent with their gender identity." 897 F.3d 518, 523 (3rd Cir. 2018). The Third Circuit found that the school district's policy served "a compelling state interest in not discriminating against transgender students" and was narrowly tailored to that interest. *Id.* at 528. *See also Parents for Privacy v. Dallas Sch. Dist. No. 2*, 326 F. Supp. 3d 1075, 1100−01 (D. Or. 2018).

As explained by the Third Circuit:

[T]ransgender students face extraordinary social, psychological, and medical risks and the School District clearly had a compelling state interest in shielding them from discrimination. There can be no denying that transgender individuals face discrimination, harassment, and violence because of their gender identity. The risk of experiencing substantial clinical distress as a result of gender dysphoria is particularly high among children and may intensify during puberty. The Supreme Court has regularly held that the state has a compelling interest in protecting the physical and psychological well-being of minors. We have similarly found that the government has a compelling interest in protecting and caring for children in various contexts. Mistreatment of transgender students can exacerbate gender dysphoria, lead to negative educational outcomes, and precipitate self-injurious behavior. When transgender students face discrimination in schools, the risk to their wellbeing cannot be overstated—indeed, it can be life threatening. This record clearly supports the District Court's conclusion that the School District had a compelling state interest in protecting transgender students from discrimination.

Moreover, the School District's policy fosters an environment of inclusivity, acceptance, and tolerance. As the appellees' amicus brief from the National

A017

Education Association convincingly explains, these values serve an important educational function for both transgender and cisgender students. When a school promotes diversity and inclusion, classroom discussion is livelier, more spirited, and simply more enlightening and interesting [because] the students have the greatest possible variety of backgrounds. Students in diverse learning environments have higher academic achievement leading to better outcomes for all students. Public education must prepare pupils for citizenship in the Republic, and inclusive classrooms reduce prejudices and promote diverse relationships which later benefit students in the workplace and in their communities. Accordingly, the School District's policy not only serves the compelling interest of protecting transgender students, but it benefits all students by promoting acceptance.

*Id.* at 528−29 (internal quotation marks and citations omitted).

The Court finds that the compelling state interest described by the Third Circuit also applies to fostering a non-discriminatory, safe, and inclusive environment at Jeffco schools and in school-sponsored outside activities like Outdoor Lab and sports tournaments. Further, the *Doe* court found a general locker room policy was narrowly tailored, whereas the appellants contended that a more tailored solution was to provide single-user accommodations for all students. *Id.* at 530. While the Third Circuit roundly rejected this unpersuasive argument, which "fail[ed] to comprehend the depths of the problems the School District's policy was trying to remedy or the steps taken to address them," *id.*, the situations in this case do provide for single-use privacy. The bunkhouses have private changing spaces and the restroom and shower stalls are single-occupancy and have doors or thick, long privacy curtains. ECF No. 32 at 24, Pls.' Supp. Appx. at 22; ECF No. 36-3, Am. Compl., Ex. C at 14. Therefore, the Outdoor Lab goes even further in the way of privacy than school bathroom and locker rooms, for which courts (like the Third Circuit in *Doe*) have found that students do *not* have a fundamental right to privacy.

A018

Moreover, it is common knowledge that hotel rooms have bathrooms with doors for privacy during sports travel. Just as in *Doe*, Jeffco's policy is narrowly tailored to meet its compelling state interest.

The Court therefore concludes that Plaintiffs have failed to state a claim under Federal Rule of Civil Procedure 12(b)(6) and dismisses Counts II and IV with prejudice.

### C.    Plaintiffs' Renewed Motion for Preliminary Injunction is Denied

To obtain a preliminary injunction, the movant must show that it has a substantial likelihood of success on the merits. *Aposhian*, 958 F.3d at 978. "The moving party has the burden to demonstrate they are entitled to a preliminary injunction" and "[w]hile it is not necessary that plaintiffs prove their likelihood of success beyond all doubt, plaintiffs must show a reasonable probability they will ultimately be entitled to the relief sought on the merits." *Speight v. Gordon*, 582 F. Supp. 3d 897, 903 (D. Wyo. 2022) (citing *Kiowa Indian Tribe of Okla. v. Hoover*, 150 F.3d 1163, 1171 (10th Cir. 1998); *Cont'l Oil Co. v. Frontier Refining Co.*, 338 F.2d 780, 781 (10th Cir. 1964) (per curiam)). "They must show more than a mere possibility of success on the merits." *Id.* (citation omitted). Further, a movant for a preliminary injunction must show irreparable harm if the injunction is denied. *Aposhian*, 958 F.3d at 978.

Given this Court's ruling dismissing the Amended Complaint, ECF No. 36, with prejudice, it is clear that Plaintiffs cannot succeed on the merits, let alone have a substantial likelihood of success on the merits. Further, Plaintiffs have shown no irreparable injury, as their alleged fundamental constitutional rights are not violated in this

A019

case. *See supra* Sect. III. The Court therefore denies Plaintiffs' Renewed Motion for Preliminary Injunction, ECF No. 48.

## IV.    CONCLUSION

For the foregoing reasons, it is

ORDERED that Defendants' Motion to Dismiss Plaintiffs' Amended Complaint, ECF No. 41, is GRANTED and Plaintiffs' Amended Complaint, ECF No. 36, is DISMISSED with prejudice. It is

FURTHER ORDERED that Defendants' Motion to Dismiss Plaintiffs' Complaint, ECF No. 34, is DENIED as moot. *See Davis v. TXO Prod. Corp.*, 929 F.2d 1515, 1517 (10th Cir. 1991) ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect."); *Scott v. Buckner Co.*, 388 F. Supp. 3d 1320, 1324 (D. Colo. 2019) (stating that any motion to dismiss directed at a superseded pleading is moot). It is

FURTHER ORDERED that Plaintiffs' Renewed Motion for Preliminary Injunction, ECF No. 48, is DENIED.

DATED: August 7, 2025

BY THE COURT:

_____
REGINA M. RODRIGUEZ
United States District Judge

A020

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Regina M. Rodriguez**

Civil Action No. 1:24-cv-02439-RMR-NRN

JOSEPH and SERENA WAILES, et al.,

      Plaintiffs,

v.

JEFFERSON COUNTY PUBLIC SCHOOLS, and
JEFFERSON COUNTY PUBLIC SCHOOLS BOARD OF EDUCATION,

      Defendants.

---

**FINAL JUDGMENT**

---

In accordance with the orders filed during the pendency of this case, and pursuant to Fed. R. Civ. P. 58(a), the following Final Judgment is hereby entered.

Pursuant to Order entered by United States District Judge Regina M. Rodriguez on August 7, 2025 [ECF No. 74] it is

ORDERED that Defendants' Motion to Dismiss Plaintiffs' Amended Complaint [ECF 41] is GRANTED and Plaintiffs' Amended Complaint [ECF No. 36] is DISMISSED with prejudice. It is

FURTHER ORDERED that Defendants' Motion to Dismiss Plaintiffs' Complaint [ECF No. 34] is DENIED as moot. It is

FURTHER ORDERED that Plaintiff's Renewed Motion for Preliminary Injunction [ECF No. 48] is DENIED.

FURTHER ORDERED that judgment is entered in favor of the Defendants and against the Plaintiffs.

This case will be closed.

**A021**

Dated at Denver, Colorado this 7th day of August, 2024.

FOR THE COURT:
JEFFREY P. COLWELL, CLERK


By:   s/K. Myhaver
      K. Myhaver
      Deputy Clerk

**A022**