No. 25-1341

# In the United States Court of Appeals for the Tenth Circuit

JOSEPH AND SERENA WAILES, *et al.*,

*Plaintiffs-Appellants*,

v.

JEFFERSON COUNTY PUBLIC SCHOOLS AND
JEFFERSON COUNTY PUBLIC SCHOOLS
BOARD OF EDUCATION,

*Defendants-Appellees*.

On Appeal from the U.S. District Court for the District of Colorado,
No. 1:24-cv-02439-RMR, Honorable Regina M. Rodriguez, District Judge

## BRIEF OF MELISSA MOSCHELLA, PH.D. AS *AMICA CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLANTS

ERIC N. KNIFFIN
Ethics and Public Policy Center
1730 M St., N.W. Ste. 910
Washington, DC 20036
Tel: (719) 212-4391
ekniffin@eppc.org

*Counsel for Amica Curiae*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ ii

INTEREST OF AMICA CURIAE ...............................................................1

INTRODUCTION .......................................................................................2

ARGUMENT ..............................................................................................4

    I.     The Free Exercise Clause Alone Requires Reversal. ..................4

    II.    Combining Free Exercise Claims with Parental Rights Claims Further Strengthens Plaintiff-Appellants' Case .......................................7

    III.   The Parental Rights Claim Alone Warrants Strict Scrutiny and a Ruling in Favor of the Parents. ....................................................................9

        A. The Importance of Parental Rights under Supreme Court Precedent. ...............................................................................9

        B. *Meyer* and *Pierce* Incorporated the Common Law Understanding of Parental Rights into the Liberty Protected by the Fourteenth Amendment. .........................................................................11

        C. Parental Rights are Essential to Limited Government. ........14

        D. Parental Rights Under *Pierce*, *Meyer*, and the Common Law Tradition Extend Beyond the Schoolhouse Door. ................15

        E. History and Tradition Indicate that the Proper Standard of Review in Parental Rights Cases is Strict Scrutiny. ............................21

        F. Application to the Current Case. ........................................24

CONCLUSION ........................................................................................26

# TABLE OF AUTHORITIES

<u>Cases</u>                                                                    <u>Page(s)</u>

*Bartels v. Iowa*,
    262 U.S. 404 (1923)...............................................................................22, 23

*Brown v. Ent. Merchs. Ass'n*,
    564 U.S. 786 (2011) ....................................................................................13

*Carson ex rel. O.C. v. Makin*,
    596 U.S. 767 (2018)......................................................................................4

*Dobbs v. Jackson Women's Health Org.*,
    597 U.S. 215 (2022)...............................................................................3, 10

*Emp. Div. v. Smith*,
    494 U.S. 872 (1990)......................................................................................7

*Espinoza v. Mont. Dep't of Revenue*,
    591 U.S. 464 (2020)................................................................................2, 4, 5

*Farrington v. Tokushige*,
    273 U.S. 284 (1927)....................................................................................15

*Lee v. Poudre Sch. Dist. R-1*,
    135 F.4th 924 (10th Cir. 2025)....................................................................10

*Mahmoud v. Taylor*,
    606 U.S. 522 (2025)..............................................................2, 5, 7, 10, 24

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010)....................................................................................13

*Meyer v. Nebraska*,
    262 U.S. 390 (1923)...........................................................................3, 11, 14

*Morrow v. Wood*,
    35 Wis. 59 (1874) ......................................................................................18

*Parham v. J.R.*,
    442 U.S. 584 (1979) ...................................................................................20

ii

*People ex rel. O'Connell v. Turner*,
  55 Ill. 280 (1870) ............................................................................13

*Pierce v. Society of the Sisters*,
  268 U.S. 510 (1925)..........................................3, 9, 12, 15, 16, 17

*Prince v. Massachusetts*,
  321 U.S. 158 (1944)............................................................................8

*Rulison v. Post*,
  79 Ill. 567 (1875)..............................................................................18

*Sch. Bd. Dist. No. 18 v. Thompson*,
  103 P. 578  (Okla. 1909) ...............................................18, 19, 20, 23

*Shelton v. Tucker*,
  364 U.S. 479 (1960)............................................................................2

*Sherbert v. Verner*,
  374 U.S. 398 (1963)............................................................................4

*Society of the Sisters  v.  Pierce*,
  296  F.  928 (D. Or. 1924) ............................................................... 22

*State ex rel. Andrew v. Webber*,
  8 N.E. 708 (Ind. 1886) ....................................................................18

*State ex rel. Kelley v. Ferguson*,
  95 Neb. 63 (1914) .............................................................................18

*State ex rel. Sheibley v. Sch. Dist. No. 1*,
  144 N.W. 1039 (Neb. 1891).............................................................18

*Troxel v. Granville*,
  530 U.S. 57 (2000)........................................................................3, 10

*Trs. of Schs. v. People*,
  87 Ill. 303 (1877)..............................................................................18

*Washington v. Glucksberg*,
  521 U.S. 702 (1997)......................................................................3, 26

*Wisconsin v. Yoder*,
  406 U.S. 205 (1972)............................................................3, 8, 9, 26

**Other Authorities**

Helen Alvaré, *Families, Schools, and Religious Freedom*,
  54 Loy. U. Chi. L.J. 579 (2022)..................................................8, 24

Randy Barnett & Evan Bernick, *The Privileges or Immunities Clause, Abridged :
  A Critique of Kurt Lash on the Fourteenth Amendment*,
  95 Notre Dame L. Rev. 499 (2019) .............................................13

Noa Ben-Asher, *The Lawmaking Family*, 90 Wash Univ. L. Rev. 363 (2012)......19

Emily Buss, *Passively Virtuous Parental Rights*, Notre Dame L. Rev.
  (forthcoming 2025)............................................................9

Joseph Griffith II, '*Tender and Sacred Ties': The Abolitionist Defense of Parental
  Rights and the Thirteenth and Fourteenth Amendments*, *in*
  Constitutionalism and Liberty (2025) ....................................13

Martin Guggenheim, What's Wrong with Children's Rights
  (Harv. Univ. Press 2005)........................................................14, 15

Harvard Law School, *Do Parental Rights Extend Beyond the Schoolhouse
  Door?* (YouTube, Nov. 20, 2024), https://bit.ly/4ogFqcK ...........................2

2 James Kent, Commentaries on American Law........................................11, 20

Melissa Moschella, *Beyond Equal Liberty: Religion as a Distinct Human
  Good and the Implications for Religious Freedom*,
  32 J.L. & Religion 123 (2017)....................................................1

Melissa Moschella, Carson v. Makin, *Free Exercise, and the Selective Funding
  of State-Run Schools*, J. Religion, Culture & Democracy (2025)..............1

Melissa Moschella, *Defending the Fundamental Rights of Parents: A response
  to Recent Attacks*, Notre Dame J. L. Ethic & Pub. Pol'y 397  (2023) ......... 1, 15

Melissa Moschella, *Do Parental Rights Extend Beyond the Schoolhouse Door?
  Correcting Misinterpretations of* Pierce *in Light of History and Tradition*,
  Notre Dame L. Rev. (forthcoming 2025) ................................................1, 17

Melissa Moschella, *Strict Scrutiny as the Appropriate Standard of Review in Parental Rights Cases: A Historical Argument*, 28 TEX. REV. L. & POL. 771 (2024) ..................................................... 1, 21, 24

MELISSA MOSCHELLA, TO WHOM DO CHILDREN BELONG? PARENTAL RIGHTS, CIVIC EDUCATION, AND CHILDREN'S AUTONOMY (Cambridge Univ. Press 2016) ...................................................... 1, 8

2 JOSEPH STORY, COMMENTARIES ON EQUITY JURISPRUDENCE (2d. ed. 1839) ................................................................................. 12

1 ST. GEORGE TUCKER, BLACKSTONE'S COMMENTARIES (1803) ............................ 11

Daniel E. Witte, People v. Bennett*: Analytic Approaches to Recognizing a Fundamental Parental Right Under the Ninth Amendment*, 1996 B.Y.U. L. REV. 183 (1996) ................................................................. 13, 14

## INTEREST OF *AMICA CURIAE*

Melissa Moschella (Ph.D., Princeton University; A.B., Harvard University) is Professor of the Practice in Philosophy at the University of Notre Dame's McGrath Institute for Church Life, and McDonald Distinguished Fellow in the Center for Law and Religion at Emory University School of Law. (Affiliations are for identification purposes.) Dr. Moschella's curriculum vitae is available here: https://perma.cc/CQF6-98LG. She is a scholar of jurisprudence and constitutional law, particularly with regard to the issues of parental rights in education and religious freedom—topics on which she has authored numerous publications, including To Whom Do Children Belong? Parental Rights, Civic Education, and Children's Autonomy (Cambridge Univ. Press 2016); *Beyond Equal Liberty: Religion as a Distinct Human Good and the Implications for Religious Freedom*, 32 J.L. & Religion 123 (2017); *Defending the Fundamental Rights of Parents: A response to Recent Attacks*, Notre Dame J.L. Ethics & Pub. Pol'y 397 (2023); *Strict Scrutiny as the Appropriate Standard of Review in Parental Rights Cases: A Historical Argument*, 28 Tex. Rev. L. & Pol. 771 (2024); Carson v. Makin*, Free Exercise, and the Selective Funding of State-Run Schools*, J. Religion, Culture & Democracy (2025); *Do Parental Rights Extend Beyond the Schoolhouse Door? Correcting Misinterpretations of* Pierce *in Light of History and Tradition*, Notre Dame L. Rev. (forthcoming 2025). She also delivered the 2024 Vaughan Lecture at

1

Harvard Law School on the subject: "How Broad and Strong are Parental Rights Under *Pierce*?" (which can be seen at HARVARD LAW SCHOOL, *Do Parental Rights Extend Beyond the Schoolhouse Door?* (YouTube, Nov. 20, 2024), https://bit.ly/4ogFqcK). Professor Moschella submits this brief[1] in support of reversal of the District Court's orders denying Appellants' motion for a preliminary injunction and dismissing Appellants' complaint.

## INTRODUCTION

"The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Shelton v. Tucker*, 364 U.S. 479, 487 (1960). Among these freedoms is the right to the free exercise of religion. "Government schools, like all government institutions, may not place unconstitutional burdens on religious exercise." *Mahmoud v. Taylor*, 606 U.S. 522, 545 (2025). This constitutionally protected religious liberty includes "the rights of parents to direct 'the religious upbringing' of their children." *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 486 (2020) (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 213–14 (1972)). The Supreme Court's decisions in *Mahmoud*, *Carson*, *Espinoza*, *Yoder*, and many other cases make clear that Appellants' free exercise claims trigger

---

[1] All parties have consented to the filing of this brief. No counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amica curiae* or her counsel made any monetary contribution intended to fund the preparation or submission of this brief.

application of strict scrutiny. Jeffco's policy of requiring students to share bedrooms and bathrooms with individuals of the opposite sex, while withholding parental notice and refusing accommodations, plainly does not satisfy strict scrutiny.

But this case implicates more than parents' free exercise rights. It also implicates their related and "fundamental right . . . to make decisions concerning the care, custody, and control of their children" which is "perhaps the oldest of the fundamental liberty interests recognized by" the Supreme Court. *Troxel v. Granville*, 530 U.S. 57, 63, 65–66 (2000). And it is incontrovertible that strict scrutiny applies "when the interests of parenthood are combined with a free exercise claim." *Yoder*, 406 U.S. at 233.

Indeed, the infringement of parents' educational rights is alone sufficient to trigger the application of strict scrutiny. This follows from a proper, historically informed understanding of the Supreme Court's decision in *Meyer v. Nebraska*, 262 U.S. 390 (1923), and *Pierce v. Society of the Sisters*, 268 U.S. 510 (1925). The view of parental rights set forth in those cases is consistent with the Supreme Court's holding in *Washington v. Glucksberg*, 521 U.S. 702 (1997)—reaffirmed in *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022)—that substantive due process rights must be identified and defined by history and tradition.

Conflicts between parents and public schools have proliferated in recent years, as schools grapple with sensitive and contentious issues like sexuality and gender.

So while this court could rule for Appellants on free exercise grounds alone—or in conjunction with their parental rights claims—this case presents an important and timely opportunity to reaffirm the Constitution's historically grounded protections for parental rights.

## ARGUMENT

## I. The Free Exercise Clause Alone Requires Reversal.

"A State violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits." *Carson ex rel. O.C. v. Makin*, 596 U.S. 767, 778 (2018). For example, in *Sherbert v. Verner*, the Supreme Court held that the Free Exercise Clause prohibits a State from withholding unemployment benefits on the ground that an individual lost her job for refusing to abandon the dictates of his faith. 374 U.S. 398, 403–04 (1963).

Several recent cases apply this principle in the context of public education. Start with *Espinoza*. There, the Supreme Court considered a provision in the Montana Constitution that required the State to exclude religious schools from a public scholarship program. 591 U.S. at 468. The Court held that this provision violated the Free Exercise Clause for two reasons. First, the provision discriminated against religious schools based on their religious status. *See id*. at 477. Second, and more relevant here, the provision burdened "the rights of parents to direct the religious upbringing of their children" by cutting them off from otherwise available

4

public benefits if they chose to send their children to "a religious private school rather than a secular one." *Id*. at 486 (quotation marks omitted).

The Court built on *Espinoza* last term in *Mahmoud*. There, the Court held that a school board violated parents' free exercise rights by introducing "LGBTQ+-inclusive" storybooks into the curriculum while withholding notice to parents and forbidding opt-outs. *Mahmoud*, 606 U.S. at 550. The Court explained that "[p]ublic education is a public benefit," and the government cannot condition the availability of that benefit "on parents' willingness to accept a burden on their religious exercise." *Id*. at 561. It then held that the board's policies burdened parents' religious exercise by interfering with their ability "to raise their children in their religious faiths." *Id*. at 562. Thus, the policies required parents to choose between the opportunity to avail themselves of a public benefit—the public schools—and the right to direct the religious upbringing of their children. The Court made clear that this forced choice is no less unconstitutional in the context of public education than in any other context.

That principle controls this case. Jeffco has adopted a policy of requiring children to share bedrooms and bathrooms with individuals of the opposite sex on overnight school trips. The Parent-Appellants ("the Parents") cannot, consistent with their religious beliefs, allow their young children to share intimate spaces with individuals of the opposite sex. App.027. The Parents explain that doing so would

be inconsistent with their religious beliefs—including beliefs about sex, bodily privacy, interactions with the opposite sex, and sexual modesty. *Id.* Jeffco has nonetheless withheld notice from the Parents, and it has refused to accommodate them by ensuring that their children are placed in rooms with only individuals of the same sex. App.030. In short, Jeffco has forced the Parents to choose between availing themselves of a public benefit—the benefit of overnight school trips—and their right to direct the religious upbringing of their children. Under *Sherbert*, *Mahmoud*, and every precedent in between, that forced choice burdens the Parents' free exercise rights.

Such a burden is constitutional only if it satisfies strict scrutiny—that is, only if it is narrowly tailored to a compelling state interest. Jeffco's practice plainly is not. Jeffco has no compelling interest in requiring young children to share intimate spaces with persons of the opposite sex. And whatever interest Jeffco purports to serve through its policy, it could surely achieve that interest while respecting the Parents' religious rights. It could, for example, simply ensure that the Parents' children are not placed in rooms with individuals of the opposite sex. Indeed, Jeffco places individuals who identify as transgender in rooms according to their preferences. App.030. There is no reason that Jeffco could not afford the same accommodation to the Parents' children.

Granting accommodations to the Parents would not be burdensome. But even if it were, that would be no answer. In *Mahmoud*, the school board argued that it could not allow parents to opt their children out of the reading "LGBTQ+-inclusive storybooks" because doing so might lead to "unsustainably high numbers of absent students." 606 U.S. at 567 (cleaned up). The Supreme Court nonetheless held that opt-outs were required. Under *Mahmoud*, Jeffco clearly must grant the Parents' requests.

## II.    Combining Free Exercise Claims with Parental Rights Claims Further Strengthens Plaintiff-Appellants' Case.

Even if *Mahmoud* alone does not resolve this case, the Parents' case is further strengthened by the fact that Jeffco's actions do not implicate free exercise rights alone but also parental rights. This case thus presents what the Supreme Court in *Employment Division v. Smith* called a "hybrid situation," in which "free exercise rights" are combined with another constitutional right, such as "the right of parents . . . to direct the education of their children." 494 U.S. 872, 881–82 (1990) (citations omitted). In assessing a hybrid-rights claim, courts must apply strict scrutiny even if the challenged law or policy is neutral and generally applicable. *See id*. Thus, *even if* the policy at issue in this case were neutral or generally applicable, strict scrutiny applies.

The School Board's policy interferes with the Parents' right to "to direct the religious upbringing of their children." *Mahmoud*, 606 U.S. at 547 (quotations

omitted). Indeed, requiring children to share intimate spaces with individuals of the opposite sex touches upon sensitive and intimate matters regarding sexuality—such as interactions with the opposite sex and appropriate sexual modesty—that are central to the Parents' religious beliefs. As one scholar explains, "Old and New Testament scriptures persistently point to human beings' ordinary romantic . . . relationships and experiences as pathways for glimpsing foundational religious beliefs." Helen Alvaré, *Families, Schools, and Religious Freedom*, 54 LOY. U. CHI. L.J. 579, 580 (2022).

Because Jeffco's policy implicates intimate moral and religious beliefs, Jeffco's failure to accommodate the Parents' objections strikes at the core of their educational rights. "The parent's conflict with the state over control of the child and his training is serious enough when only secular matters are concerned. It becomes the more so when an element of religious conviction enters*.*" *Prince v. Massachusetts*, 321 U.S. 158, 165 (1944); *see also* Melissa Moschella, *To Whom Do Children Belong?* 2016, 66 ("The particularly weighty and personal nature of parents' obligation to educate their children morally and religiously implies that respecting parents' right[s] ... requires granting them a highly protected sphere of authority to make decisions about the moral and religious content of education.") All of these concerns are magnified due to the young ages of the children involved. "[T]he values of parental direction of the religious upbringing and education of their

children in their early and formative years have a high place in our society." *Yoder*, 406 U.S. at 213–14.

In sum, Jeffco's policy implicates not only the Parents' religious rights but also their parental rights. Thus, *even if* the policy were neutral and generally applicable, strict scrutiny still applies under *Smith* because the case presents a hybrid-rights claim: the policy infringes both parental rights and free exercise rights. And, as explained, the policy clearly fails to meet the requirements of strict scrutiny.

## III.  The Parental Rights Claim Alone Warrants Strict Scrutiny and a Ruling in Favor of the Parents.

### A.    The Importance of Parental Rights under Supreme Court Precedent

In *Pierce*, Justice McReynolds, writing for a unanimous court, famously stated:

> The fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the State to standardize its children by forcing them to accept instruction from public teachers only. The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations.

268 U.S. at 535. Every Supreme Court decision touching upon parental rights— including those reversing other *Lochner*-era substantive due process decisions—has reaffirmed *Pierce* unequivocally. *See* Emily Buss, *Passively Virtuous Parental Rights*, NOTRE DAME L. REV. (forthcoming 2025).

For example, in *Mahmoud*, the Court cited *Pierce* for the proposition that the Constitution "protects … a parent's decision to send his or her child to a private religious school instead of a public school." 606 U.S. at 547. And in *Troxel*, the Court spoke of the "fundamental right of parents to make decisions concerning the care, custody, and control of their children" as "perhaps the oldest of the fundamental liberty interests recognized by this Court." 530 U.S. at 65–66. Nonetheless, this court has not been clear about the appropriate standard in parental rights cases. *See Lee v. Poudre Sch. Dist. R-1*, 135 F.4th 924, 933 (10th Cir. 2025). This court should use this case to reaffirm the broad, historically grounded view of parental rights set forth in *Meyer* and *Pierce*.

Doing so would be consistent with the Supreme Court's decision in *Dobbs*, which held that substantive due process rights must be identified and defined in light of our Nation's history and tradition. 597 U.S. at 231. *Pierce* and *Meyer* were well-grounded in the traditional, common-law understanding that parents have broad, strong rights, including the right to direct the education and upbringing of their children. Indeed, parental rights encompass much more than the right to send one's child to a private school at one's own expense; they also include the right to certain exemptions and accommodations *within public schools*. And these rights merit the strong protection of strict scrutiny.

**B. *Meyer* and *Pierce* Incorporated the Common Law Understanding of Parental Rights into the Liberty Protected by the Fourteenth Amendment.**

In *Meyer* and *Pierce*, the Court made clear that the parental rights recognized by the common law tradition are part of the liberty protected by the Fourteenth Amendment. As the *Meyer* Court stated: The "liberty guaranteed . . . by the Fourteenth Amendment" includes, "[w]ithout doubt," the right "to marry, establish a home and bring up children," along with other "privileges long recognized at common law as essential to the orderly pursuit of happiness by free men." 262 U.S. at 399. Further, *Meyer* echoes the common law understanding of parental rights as based on parents' natural, pre-political obligations to maintain, protect, and educate their children: "[I]t is the natural duty of the parent to give his children education suitable to their station in life." *Id*. at 400; *see* 1 ST. GEORGE TUCKER, BLACKSTONE'S COMMENTARIES *446 (1803) ("The duty of parents . . . is a principle of natural law; an obligation . . . laid on them not only by nature herself, but by their own proper act, in bringing them into the world."); 2 JAMES KENT, COMMENTARIES ON AMERICAN LAW *189-90 (indicating that parents' natural duties to their children "consist in maintaining and educating them" and explaining that these duties fall naturally to parents because "[t]he wants and weaknesses of children render it necessary that some person maintain them, and the voice of nature has pointed out the parent as the most fit and proper person.") This same common law view of

parental duties, and corresponding rights to perform those duties without undue state interference, is even more strongly articulated in *Pierce*: "The child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." 268 U.S. at 535.

The common law tradition regarding parental rights, which *Meyer* and *Pierce* incorporate into the Fourteenth Amendment, recognizes that children are primarily (and naturally) under the jurisdiction of their parents, and that the state's role is *subsidiary* to that of parents. In other words, the state's role is to ensure that parents are at least minimally fulfilling their duties and to assist parents in fulfilling those duties when needed. But the state must perform these functions in a way that respects the primacy of parents' authority insofar as possible. Joseph Story wrote that the state is justified in interfering "with the ordinary rights of parents, as guardians by nature, or by nurture, in regard to the custody and care of their children" only in exceptional cases in which the "natural presumption[] that the children will be properly taken care of" is overridden by proof of "gross ill treatment" on the part of the parent. 2 JOSEPH STORY, COMMENTARIES ON EQUITY JURISPRUDENCE § 1341 (2d ed., 1839).

Courts in the mid-nineteenth century (around the time of the ratification of the Fourteenth Amendment) frequently echoed this language. For instance, the Illinois Supreme Court stated:

> The parent has the right to the care, custody and assistance of his child. The duty to maintain and protect it, is a principle of natural law. . . . Before any abridgment of the right, gross misconduct or almost total unfitness on the part of the parent, should be clearly proved.

*People ex rel. O'Connell v. Turner*, 55 Ill. 280, 284–85 (1870).

It should also be noted that, although *Meyer* rooted parental rights in the Fourteenth Amendment's Due Process Clause—following the favored jurisprudence of the time—these rights could also be grounded in the Privileges or Immunities Clause, or in the Ninth Amendment. *See Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 836 (2011) (Thomas, J., dissenting); *McDonald v. City of Chicago*, 561 U.S. 742, 806 (2010) (Thomas, J., concurring in part and concurring in the judgment) (suggesting that some unenumerated constitutional rights could be rooted in the Privileges or Immunities Clause); *see also* Randy Barnett & Evan Bernick*, The Privileges or Immunities Clause, Abridged: A Critique of Kurt Lash on the Fourteenth Amendment*, 95 NOTRE DAME L. REV. 499, 500 (2019) (arguing that the original meaning of the 14th Amendment's privileges or immunities clause protects some unenumerated rights); Joseph Griffith II, *'Tender and Sacred Ties': The Abolitionist Defense of Parental Rights and the Thirteenth and Fourteenth Amendments*, *in* CONSTITUTIONALISM AND LIBERTY 216-31 (2025); Daniel E. Witte,

People v. Bennett: *Analytic Approaches to Recognizing a Fundamental Parental Right Under the Ninth Amendment*, 1996 B.Y.U. L. REV. 183, 261 (1996). Thus, the analysis provided here is relevant regardless of one's views regarding the best constitutional anchor for parental rights.

### C. Parental Rights Are Essential to Limited Government.

*Meyer* emphasized that respect for parental rights is at the core of limited, constitutional government. To make this point, the Court discussed Plato's proposal for communal childrearing in the *Republic* and the Ancient Spartan practice of taking male children away from their parents at age seven to be educated by state officials. The Court explained that these measures could not be imposed in this Nation "without doing violence to both letter and spirit of the Constitution." *Meyer*, 262 U.S. at 402. While the Nebraska law at issue was not quite as dramatic as these ancient practices—it merely forbade the teaching of foreign languages prior to the ninth grade—the Court's point was to highlight that the law reflected the same statist denial of the primacy of parental educational authority.

This denial is fundamentally incompatible with limited, constitutional government committed to preserving the liberty of the people. Indeed, common sense makes clear the connection between respect for the primacy of parents' educational authority and limited government, for "the ideal of government serving the people's will" is incompatible with the state using its power to mold people's

14

will by controlling children's education. MARTIN GUGGENHEIM, WHAT'S WRONG WITH CHILDREN'S RIGHTS 24–25 (Harv. Univ. Press 2005). "Recognizing and respecting that the family . . . is an authoritative community with the right to direct its own internal affairs is an essential and crucial feature of limited government." Moschella, *Defending the Fundamental Rights of Parents, supra*, at 411. "Indeed . . . a hallmark of totalitarianism is the effective elimination of all mediating institutions between the individual and the state." *Id.* at 411–12. "The family is arguably the original and most crucial of these mediating institutions." *Id.* at 412.

### D. Parental Rights Under *Pierce*, *Meyer*, and the Common Law Tradition Extend Beyond the Schoolhouse Door.

Some lower courts have read *Pierce* to hold *only* that parents must be legally free to educate their children at private schools. It is true that *Pierce* said the state cannot "standardize its children by forcing them to accept instruction from public teachers only." 268 U.S. at 535. But that is because this particular mode of standardizing children was all that was at issue in the case, *not* because the Court thought that this was the only constitutionally forbidden way for the state to attempt to standardize children. Indeed, in *Farrington v. Tokushige*, decided just two years after *Pierce* and by many of the same justices, the Court held that the government also violates constitutionally protected parental rights when it undermines the autonomy of private schools through extensive government regulation. 273 U.S. 284, 298 (1927).

15

Further, the text of the *Pierce* Opinion suggests that the state's educational authority has limited scope and should be understood as subsidiary to the educational authority of parents. *Pierce* stated:

> No question is raised concerning the power of the State reasonably to regulate all schools, to inspect, supervise and examine them, their teachers and pupils; to require that all children of proper age attend some school, that teachers shall be of good moral character and patriotic disposition, that certain studies plainly essential to good citizenship must be taught, and that nothing be taught which is manifestly inimical to the public welfare.

268 U.S. at 534. Note the semicolon after the first clause. The items listed after the semicolon indicate the scope of state educational regulation that does not raise constitutional questions. Thus, the state may require: (1) "that all children of proper age attend some school," (2) "that teachers shall be of good moral character and patriotic disposition," (3) "that certain studies plainly essential to good citizenship must be taught," and (4) "that nothing be taught which is manifestly inimical to the public welfare." *Id.* Any state action in the educational arena falling outside of these four categories is an action about which constitutional questions *are* raised.

*Farrington* supports this interpretation. The regulations at issue in that case were outside these categories, so the Court therefore held that they were unconstitutional. Moreover, this interpretation is the only way to make sense of *Pierce*. Otherwise, it would have made no sense for the Court to claim that the statute in question had "no reasonable relation to some purpose within the competency of

16

the State," for the statute had a clear relation to many state interests (such as the assimilation of immigrants). *Id*. at 535. Indeed, the law at issue in *Pierce*—which required all students to attend public schools—went beyond the four categories listed above, which is arguably why the Court held that the law fell outside the competency of the state and intruded upon the prior educational authority of parents.[2]

The idea that state educational authority should be limited in this way also follows from the general common law principles that *Pierce* and *Meyer* presupposed, for those principles make clear that *parents* have the primary duty and corresponding authority to control their children's education and upbringing. Thus, state action in this arena should respect parental authority except when this is incompatible with the state's interest in ensuring that all children have access to an education that will prepare them to be law-abiding and productive citizens. *Pierce*'s enumeration of constitutionally permissible state educational regulations—*i.e.*, that all children receive a basic education, that teachers themselves be good citizens, that studies "plainly essential to good citizenship" be taught, and that those "manifestly inimical to the public welfare" be forbidden—makes sense in light of this general principle. 268 U.S. at 534.

---

[2] For a more detailed defense of this interpretation, *see* Moschella, *Do Parental Rights Extend Beyond the Schoolhouse Door?*, *supra*.

State supreme court decisions based upon common law likewise support this interpretation and provide even clearer evidence that parents' rights were historically understood to include the right to direct their children's education *even within the public schools*. From the mid-nineteenth to the early twentieth century, eight cases considered claims of parents who sought to exempt their children from some aspect of the public school curriculum, while still being able to enjoy the benefit of a free public school education for their children. In seven of those cases, the parents prevailed.[3] The state supreme courts in these cases argued on the basis of common law that parents by nature possess primary educational authority over their children and that this implies a right to control their children's education even within the public schools, except when this control is incompatible with the discipline and efficiency of the schools. *Sch. Bd. Dist. No. 18 v. Thompson*, 103 P. 578 (Okla. 1909); *Morrow v. Wood*, 35 Wis. 59 (1874); *Rulison v. Post*, 79 Ill. 567 (1875); *Trs. of Schs. v. People*, 87 Ill. 303 (1877); *State ex rel. Sheibley v. Sch. Dist. No. 1*, 31 Neb. 552 (1891); *State ex rel. Kelley v. Ferguson*, 144 N.W. 1039 (Neb. 1914).

To take just one example that is representative of (and makes reference to) parallel cases from other states, *Thompson* involved parents who brought suit after their children were expelled from the public school because they refused (at their

---

[3] The outlier is *State ex rel. Andrew v. Webber*, 8 N.E. 708 (Ind. 1886), which ruled against the parents.

parents' command) to participate in singing lessons. *See* 103 P. at 578. The parents

sought to have their children reinstated to the schools but exempted from the singing

lessons, and the Oklahoma Supreme Court decided in their favor. *See id*. at 582.

The court explicitly rooted its holding on the common law view that parents

possess natural duties and corresponding rights to direct the education and

upbringing of their children:

> At common law the principal duties of parents to their legitimate
> children consisted in their maintenance, their protection, and their
> education. These duties were imposed upon principles of natural law
> and affection laid on them not only by Nature herself, but by their own
> proper act of bringing them into the world.

*Id*. at 578–79 (citing 1 LEWIS', BLACKSTONE, § 447). The court also clarified that the

"common-law doctrine that the parent had entire control over the education of his

child" remained intact even after the introduction of compulsory education laws,

because those laws simply require parents to fulfill their natural duty in a minimally

satisfactory way. Further, the court emphatically denied that "the mere act of sending

the children to school amounts to a delegation of parental authority which the law of

the land places in the hands of the parent." *Id*. at 581. As one scholar has observed,

"[s]chools in the common-law era were viewed as service providers whose authority

stems from the delegation of parents." Noa Ben-Asher, *The Lawmaking Family*, 90

WASH. UNIV. L. REV. 363, 381 (2012). Thus, parents are "free to a great extent to

select the course of study" within the public schools, as long as this is compatible

with the "'proper discipline, efficiency, and well-being of the common schools.'"
*Thompson*, 103 P. at 580–81 (quoting *Morrow*, 35 Wis. at 66). The *Thompson* court,
along with the other courts that made similar rulings, judged that it is indeed
compatible.

    The *Thompson* Court further argued that one strong reason for deferring to
parents' judgments about what their child should (and shouldn't) be taught is that
parents generally have a much greater interest in the child's welfare, and much
greater knowledge of the child's needs and capacities, than any teacher or school
official. *Id*. at 580. This argument also echoes the common-law presumption that
"the voice of nature has pointed out the parent as the most fit and proper person" to
make child-rearing decisions. 2 KENT, *supra*, at 189; *see also Parham v. J.R.*, 442
U.S. 584, 602 (1979) (The law "historically . . . has recognized that natural bonds of
affection lead parents to act in the best interests of their children.").

    The *Thompson* court therefore ruled in favor of the parents, and it held:

> The parent . . . has a right to make a reasonable selection from the
> prescribed course of study for his child to pursue, and this selection
> must be respected by the school authorities, as the right of the parent in
> that regard is superior to that of the school officers and the teachers.

103 P. at 582. And the right of the parent is superior for the reasons noted above:
that, by nature and common law, education is primarily the duty of the parent; and
that the parent has greater interest in the child's welfare and knowledge of the child's
capacities.

### E. History and Tradition Indicate that the Proper Standard of Review in Parental Rights Cases is Strict Scrutiny.

Correcting the historically inaccurate interpretation of parents' *Meyer-Pierce* rights requires recognizing not only that parents' educational rights extend far beyond the right to send one's child to a private school at one's own expense, but also that strict scrutiny is the appropriate standard of review in parental rights cases. Indeed, *Meyer*, *Pierce*, and the string of state supreme court cases discussed in the previous section all implicitly applied what today would be called a strict scrutiny test. Further, the requirement that laws interfering with parental rights be narrowly tailored to a compelling state interest is simply a way of capturing the strong deference to parental authority that has been present throughout our nation's legal history and tradition. *See* Moschella, *Strict Scrutiny as the Appropriate Standard*, *supra*, at 771–72.

Of course, all these cases were decided prior to the development of modern tiers of scrutiny. Thus, we cannot expect them to explicitly indicate that they are applying strict scrutiny. To determine this, we therefore need to examine these decisions to see if they effectively asked whether the laws or policies at issue were narrowly tailored to a compelling state interest and if they placed the burden of proof on the state, which is also indicative of heightened scrutiny. Even a cursory reading of these cases makes it clear that this is in fact what they were doing.

In *Pierce*, for instance, the law at issue did have a reasonable relationship to a legitimate state interest. If *Pierce* had been applying what we today call the rational basis test, the Court would have upheld the law. Instead, following the reasoning of the Oregon District Court whose ruling *Pierce* affirmed, we see that the Court placed the burden of proof on the state to defend its law, rather than on the petitioners to prove that the act lacked a reasonable relation to a legitimate state interest. Consider the core of the Oregon District Court's argument:

> Compulsory education being the paramount policy of the state, can it be said, with reason and justice, that the right and privilege of parochial and private schools to teach in the common school grades is inimical or detrimental to, or destructive of, that policy? … No one has advanced the argument that teaching by these schools is harmful, or that their existence with the privilege of teaching in the grammar grades is a menace, or of vicious potency, to the state or the community at large. . . . It would seem that the act in question is neither necessary nor essential for the proper enforcement of the state's school policy.

*Society of the Sisters v. Pierce*, 296 F. 928, 937 (D. Or. 1924). The court clearly puts the burden of proof on the state and requires the state to prove not merely that the law is related to some legitimate interest, but rather that the law is "necessary" or "essential" to the state's compulsory education policy and the interests it serves. This is the language of what we today call strict scrutiny, not the language of the rational basis test.

The reasoning in *Meyer* is similar. Indeed, Justice Holmes explicitly pointed out in his dissent in *Bartels v. Iowa* that the law at issue in *Meyer* had a reasonable

relationship to a legitimate state interest, and that it therefore should have survived a rational basis test. *See* 262 U.S. 404, 412 (1923) (Holmes, J, dissenting in part). The *Meyer* Court nonetheless held that the law was unconstitutional.

Finally, the same is true of *Thompson* and of the six similar pre-*Meyer* state supreme court cases related to parental rights in education. Like *Meyer* and *Pierce*, *Thompson* placed the burden of the proof on the state to justify its action, and it criticized the one outlier case that ruled against parents precisely because that case placed burden of proof upon parents rather than the state:

> We think it would be a reversal of the natural order of things to presume that a parent would arbitrarily and without cause or reason insist on dictating the course of study of his child in opposition to the course established by the school authorities. A better rule, we think, would be to presume, in the absence of proof to the contrary, that the request of the parent was reasonable and just, to the best interest of the child, and not detrimental to the discipline and efficiency of the school.

103 P. at 582 (criticizing the reasoning in *State ex rel. Andrew v. Webber*, 108 Ind. 31 (1886)). Further, the *Thompson* court effectively required the state to show that its action was narrowly tailored to its interest in the education of future citizens, and in the efficiency of the public schools established for that end. And the court ruled that the state could not require all students to participate in all the lessons offered in the public school because there was no evidence that accommodating the parents' request would be incompatible with that interest.

While doctrines regarding tiers of scrutiny are a relatively recent development, these cases show that there is clear historical precedent for employing strict scrutiny when parental rights are at stake. These cases therefore demonstrate that strict scrutiny is the appropriate standard of review for parental rights cases.[4]

### F. Application to the Current Case

The application to the case currently before this court is obvious. A historically informed understanding of parental rights under *Pierce* and *Meyer* indicates that parents have the right to an accommodation when their children's participation in educational activities would interfere with "the choices that [they] wish to make for their children outside the home," *Mahmoud*, 606 U.S. at 547, as long as the accommodation is not incompatible with the ability of the schools to operate in a reasonably-efficient manner. And this opt-out right is precisely what the Parents are asking this court to vindicate.

This Court might worry that this broad view of parental rights will lead to a flurry of litigation. But this worry is unfounded.[5] Litigation is extremely costly, so parents are unlikely to litigate without serious cause. Further, if this Court clarifies that parents have rights to certain accommodations, schools will take notice and be

---

[4] For more detailed arguments in defense of these claims, *see* Moschella, *Strict Scrutiny as the Appropriate Standard*, *supra*, at 771.

[5] *See* Alvaré, *supra*, at 621.

more accommodating at the outset, which will eliminate the need for litigation on the back-end. Nor are accommodations unworkable for schools, as it has long been common practice for schools to grant accommodations. For example, schools have historically allowed parents to opt their children out of sex education lessons. Public schools also offer individualized education programs for non-religious purposes—such as programs for students with special needs or those who are especially gifted. It is not too much to ask schools to shoulder comparable burdens for the purpose of respecting parents' constitutional rights.

Further, it is essential to the rule of law that there be clarity and consistency regarding the law's requirements and application. But clarity and consistency are sorely lacking with regard to parents' constitutional rights, especially in the educational sphere. These rights touch upon a matter of no small importance to the millions of conscientious parents who take seriously their child-rearing responsibilities. Many parents—including the Appellants in this case—feel not only a natural duty but also a grave religious obligation to educate their children in accordance with their beliefs. In striving to conscientiously fulfill that obligation, these parents are not only seeking to promote the welfare of their children, but are also providing a crucial service to the nation as a whole. The Court should therefore vindicate the fundamental rights of the parents in this case. In doing so, it should reinforce broad and strong respect for parental rights, which is "deeply rooted in this

Nation's history and tradition," essential to limited government, and "implicit in the concept of ordered liberty." *Glucksberg*, 521 U.S. at 720–21 (quotation marks and citations omitted).

## CONCLUSION

There are (at least) three conclusive reasons for the Court to rule in favor of the Parents in this case and vindicate their fundamental constitutional rights. First, Jeffco's policies violate the Parents' free exercise rights under the First Amendment as recognized by *Mahmoud*, *Carson*, *Espinoza*, and many other precedents. Second, this is a case in which "the interests of parenthood are combined with a free exercise claim," *Yoder*, 406 U.S. at 233, making this a hybrid-rights case where strict scrutiny must also apply. Third, and finally, Jeffco's actions also violate the fundamental constitutional rights of parents to direct the education and upbringing of their children under *Meyer* and *Pierce*. These rights are deeply rooted, and they warrant the protection of strict scrutiny. The Court should reverse.

Dated: November 26, 2025        Respectfully submitted,

*/s/ Eric N. Kniffin*
Eric N. Kniffin
Ethics and Public Policy Center
1730 M St., N.W. Ste. 910
Washington, DC 20036
Tel: (719) 212-4391
ekniffin@eppc.org

*Counsel for Prof. Moschella, as* Amica Curiae

## CERTIFICATE OF COMPLIANCE

This document complies with the type volume limit of Fed. R. App. P. 32(G) because it contains 6,341 words, excluding the parts of the motion exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(A)(5) and the type style requirements of Fed. R. App. P. 32(A)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

Dated: November 26, 2025                    */s/ Eric N. Kniffin*
                                            Eric N. Kniffin